[No. 26360. *En Banc.* August 27, 1937.]

R. W. RUSSELL, *Respondent*, v. PASHA C. STEPHENS et al., *Appellants.*[1]

[1]Reported in 71 P. (2d) 30.

 

*E. A. Cornelius,* for appellants.

*A. O. Colburn,* for respondent.

ON REHEARING.

STEINERT, C. J.—An opinion in this case directing the affirmance of the judgment below was heretofore rendered and filed in this court on February 1, 1937. *Russell v. Stephens,* 189 Wash. 233, 64 P. (2d) 787. A petition for rehearing was subsequently granted, and later the cause was re-argued *En Banc.*

The sole question considered in the former opinion was whether the appellant Stephens, having counterclaimed for damages for breach of the contract set forth in the complaint, thereby acquiesced in the previous rescission of the same by the respondent Russell. The substance of the former decision is contained in one sentence of the opinion, as follows:

"A plea for damages for breach of the contract operates as a rescission thereof and terminates it."

That pronouncement was rested on the case of *Stevens v. Irwin,* 132 Wash. 289, 231 Pac. 783, and the cases therein cited.

Upon a further consideration of the matter, we are of the opinion that our former holding was erroneous, and that the language on which it relied, and to which it referred, in the case of *Stevens v. Irwin, supra,* was inaccurate and inappropriate.

 An action for breach of contract proceeds, not upon the theory that the contract has been rescinded, but rather upon the theory that the contract is in existence but has been violated. To rescind a contract is to declare it void in its inception and to put an end to it as though it never were; to breach a con-

tract implies a violation of a valid and subsisting obligation. When a contract is legally rescinded, the parties are restored to their *status quo* generally; when a contract is broken, as that term is used in law, the party not in default has, among other remedies, that of an action for damages against the defaulting party. 5 Page on Contracts, §§ 2878, 3023, 3024, 3027. 3 Williston on Contracts, §§ 1301-1303, pp. 2351-2355.

The vendor in a contract of sale and purchase may, upon default in payment by the vendee, declare the contract forfeited and, if the contract so provides, retain all sums paid thereon, as liquidated damages, or he may elect to sue either for specific performance or for the damages actually suffered. *Asia Investment Co. v. Levin,* 118 Wash. 620, 204 Pac. 808, 32 A. L. R. 578; *Reiter v. Bailey,* 180 Wash. 230, 39 P. (2d) 370, 97 A. L. R. 1489.

Under the law as thus declared and established, we are compelled to hold that our former opinion must be withdrawn and that the opinion in the case of *Stevens v. Irwin, supra,* must be modified to the extent of deleting therefrom the words, "thus rescinding and terminating it," following the words, "for the breach of the contract," appearing in Volume 132 of Washington Reports, page 292, line 3.

This brings us to the merits of the pending case, as reflected in the issues tried by the court.

In order to have a clear understanding of the situation, it will be necessary to analyze the pleadings, findings, and judgment, and to review the evidence supplied by the record.

In his complaint, the respondent R. W. Russell alleged that, on February 20, 1935, he entered into a contract with appellant Pasha C. Stephens, a widow, by the terms of which respondent agreed to purchase and appellant agreed to sell one hundred sixty acres

of land in Spokane county. The purchase price amounted to twenty-five hundred dollars, payable fifty dollars at the time of the execution of the contract, five hundred dollars on or before October 1, 1935, and the balance in periodic installments of one hundred dollars and two hundred dollars respectively. The five hundred dollar payment was secured by an assignment *pro tanto* of a real estate contract covering a tract of land in Stevens county and naming respondent as vendor and Deer Park Lumber Company as vendee.

The contract which is involved in the present action contained the usual provisions for forfeiture for failure to make any of the payments or to perform any of its covenants, and provided that the vendor, appellant, might, upon forfeiture, retain all sums theretofore paid, as liquidated damages.

As a part of the same transaction, appellant leased to respondent an adjoining tract of three hundred twenty acres to be used for crop-raising and pasturage.

The complaint then alleged that respondent was induced to enter into the contract by reason of the following false and fraudulent representations of appellant's agent, R. J. Hilton: (1) That the land to be purchased was located not more than two and one-half miles from a school-house, when, as a matter of fact, it was five miles distant; (2) that the property was but four miles from Dishman, the nearest trading center, when, in fact, it was seven miles distant; (3) that there was enough good pasture for two hundred head of sheep, when, in truth, because of lack of moisture, the pasture was not sufficient for anywhere near that number; and (4) that there was enough water available on the place for ten to fifteen cows, when, actu-

ally, the place had never been able to water more than four cows.

According to the complaint, these misrepresentations were made at a time of the year when a reasonable inspection of the premises by respondent would not have revealed the true water situation, and for that reason respondent relied on Hilton's representations.

The complaint further alleged that, upon discovering that the representations were false, respondent immediately elected, by written notice, to disaffirm and rescind the contract and the accompanying assignment, upon the grounds of misrepresentation as to the amount of land capable of being cultivated, the amount of crops that could be grown on the land, and the amount of water available.

The prayer of the complaint sought cancellation of the contract, lease and assignment, the return of the initial payment, and a direction to Deer Park Lumber Company to pay the proceeds of its contract to respondent.

Appellant Stephens appeared separately and answered by way of a general denial and also by counterclaim in which she asked for damages for breach of contract. So far as the record before us discloses, Hilton and Deer Park Lumber Company, who had been named as parties defendant in the complaint, did not answer. Hilton, however, testified as a witness for appellant. The reply denied the allegations of appellant's counterclaim.

The court made findings to the effect that respondent had been induced to enter into the contract by false and fraudulent representations of Hilton concerning the distance from the land to the schoolhouse, the distance from the land to Dishman, the nearest trading center, and the sufficiency of pasture to accommodate two hundred head of sheep; that, due to the higher

intelligence and greater experience of Hilton, who acted as the agent of appellant, and the inexperience and lack of education and training of respondent, the parties did not deal at arm's length; that respondent had been unable to ascertain from inspection whether the pasture was so circumstanced as to have good moisture during the summer, and that he, therefore, relied on Hilton's representations in that regard. However, the court did not find that there had been any misrepresentation as to the amount of water supply available for cattle; in its oral decision at the conclusion of the trial, the court specifically stated that respondent had not met the burden of proof in that respect.

From these findings, the court concluded that respondent was entitled to have the instruments designated in the complaint canceled, to have an order entered requiring Deer Park Lumber Company to pay respondent the sum of five hundred dollars, and to recover judgment against the appellant in the sum of fifty dollars.

The judgment followed the provisions of the conclusions of law, but ordered that respondent's action be dismissed, with costs, as to Hilton.

The assignments of error all relate to the findings made by the court, and it therefore becomes necessary to review the evidence. In doing so, we are mindful of the fact that the court had the benefit of seeing the witnesses, and we therefore proceed upon the established rule that the findings of the court are entitled to great weight and, when the evidence is conflicting, will be accepted as correct unless the evidence clearly preponderates against them. *Kelly v. Bank,* 188 Wash. 614, 62 P. (2d) 1359.

The undisputed facts are as follows: Respondent Russell is a widower fifty-five years of age. He has

eleven children, four of whom are of school age ranging from eleven to seventeen years; the rest of his children are grown. Prior to his coming to Washington, Russell had lived in South Dakota, where for thirteen years he had engaged in farming and raising stock, including sheep, hogs and cattle. At times, he had owned as many as two hundred sheep and some dairy cattle besides. His entire farming experience covered a period of thirty-seven years.

Russell moved to Washington in 1929 and took up a farm at Deer Park, in Stevens county, where he raised grain and also had from thirty-five to fifty sheep and some dairy cattle. He was, and considered himself to be, a man of experience in the raising of sheep and cattle, and thoroughly understood the need of water and pasturage for stock and the amount thereof required.

In the fall of 1934, Russell, having disposed of his land in Stevens county, desired to procure a dairy farm where, as he testified, he "could keep a few cows and sheep." Responding to a newspaper advertisement, he contacted R. J. Hilton, who lived in Spokane but who was a total stranger to him. Throughout the subsequent negotiations, Russell had only a slight and casual contact with the appellant Stephens, the record owner of the land, but dealt exclusively with Hilton, as agent.

Hilton gave Russell a list of places which he had for sale or rent, among them being the land involved in this action and which was designated in the list as being four miles southeast of *Opportunity*. The distance from Spokane to Opportunity is about eight miles, and the road between the two places runs through a village called Dishman, which is about two miles west of Opportunity.

Russell explained to Hilton that it was his desire to raise sheep and milch cows "and to do some stock rais-

ing." Hilton offered to rent the place for fifteen dollars a month. Russell desired to trade the equity in his contract with Deer Park Lumber Company upon whatever purchase of land he might make. Hilton, however, would not consider a trade for this particular piece of land, but said that the place was only for sale or rent.

During the next four months, Russell called on Hilton several times and discussed with him the particular property here in question. Although much interested in the proposition, he had not as yet seen the property.

In February, 1935, Russell and Hilton drove out to the farm in Russell's car. Owing to the fact that the road between Dishman and Opportunity was undergoing repair, their route led, in part, over a detour.

Arriving at the farm, the two men made a tour of inspection lasting a couple of hours. Upon the premises were a house and a barn, both of which were only partially completed. There were two springs on the place, a small one near the house and a larger one some distance away. A cement reservoir about five feet in diameter and eight feet in depth had recently been constructed near the smaller spring in order to conserve its supply. Russell went over the ground thoroughly and at the same time carefully inspected the buildings and water supply. He also visited the adjoining property, in which he was interested as a possible adjunct to the place that he was intending to buy. He was given every opportunity to acquaint himself with the entire property and to make any independent investigation or inquiry that he might desire. Nothing was concealed or withheld from him.

During their stay on the premises, Russell inquired of Hilton how far the children would have to walk to the nearest school and was told that it was two and

one-half miles. It appears that the distance, measured by a trail through the woods, which was regularly used by children in the neighborhood, was slightly less than two and one-half miles, but by way of the county road would be about four miles.

Upon the same occasion, Russell told Hilton that he intended to keep about fifteen or sixteen dairy cows and that he also had a chance to get eighty head of sheep. From the conversation that he then had with Hilton, Russell was satisfied that he himself knew far more about sheep-raising than Hilton did. He was also satisfied that the particular piece of land would not afford sufficient pasturage and feed for the cattle and sheep which he intended to keep, and therefore stated that he would not buy the land unless he could also obtain a lease to the adjoining tract of three hundred twenty acres, which had a number of springs upon it and afforded considerable pasturage.

About a week later, the deal was concluded and the papers were signed.

In addition to the facts just narrated, there are some further facts concerning which there is an apparent dispute.

Russell testified that, while on the tour of inspection, Hilton had said that as many as two hundred sheep, besides cows, could be kept on the place. This was an alleged remark by Hilton immediately in response to Russell's statement that he had a chance to get eighty head of sheep. Russell also testified that, upon the same occasion, Hilton had stated that the distance to *Dishman* was four miles. According to Russell, he made the inquiry concerning the distance to Dishman because he expected to haul milk into Spokane every day.

*Hilton denied that he had made either of these statements.* He testified that he made no statement what-

ever as to how many sheep the land would pasture, but left that entirely to Russell's superior knowledge. He further testified that he had told Russell that *Opportunity* was the nearest trading center and that it was four miles distant.

As to these disputed facts, the question is not so much whether the representations were made, but rather whether respondent had the right, under the circumstances, to rely upon them, if he did.

In concluding our statement of the case, we may say that Russell's disaffirmance of the contract was the result of his conversation with two persons living in the neighborhood concerning the water and pasture facilities of the place. One of these persons was the son of a former tenant against whom Hilton had previously instituted an action for recovery of possession of the premises then held under a lease; the other person was an occupant of the adjoining tract covered by the lease given to Russell.

■ It is apparent from the record that the court predicated its findings upon the theory that the parties were not dealing at arm's length, but that Russell was dominated by Hilton. In its oral decision, the court said:

"Now, if these two people could be said to be dealing with one another at arm's length and on an equal footing, there would be a question in my mind whether this court, or any court, should say that the plaintiff [Russell] should be granted any relief,"

and further:

"And no one can take this record and this exhibit [the earnest money receipt signed by Hilton] and then with a picture of the two principal actors doubt but that it was the Hilton intellect that was dominating this man Russell. That much by way of preface."

We think that the court was in error in its premise. Contrary to the court's prefatory remarks, the parties

were dealing wholly at arm's length. They were entire strangers to each other, and there was no fiduciary relationship existing between them. Russell sought every interview, and on the trial admitted that he was given every opportunity to investigate and inquire about the place. We have carefully read the record, including the exhibit referred to, and, although we do not have a picture of the parties, we do have their testimony; and from the evidence of Russell himself it is clear to us that he knew vastly more about sheep and their requirements than Hilton ever pretended to know and, consequently, relied upon his own superior knowledge.

Fraud is never presumed, but must be established by evidence that is clear, cogent and convincing. This rule is so firmly established and accepted that citation of authority is unnecessary.

Respondent's principal complaint, and the burden of his evidence, related to the insufficiency of the water supply. We need not spend any time upon that question, because the court found, and correctly so, we think, that the preponderance of the evidence was against him on that phase of the case.

The complaint with reference to the distance to the schoolhouse was not sustained, for the evidence showed that the school was actually within a distance of two and one-half miles, just as had been represented. Russell inquired as to the *walking* distance, and not the riding distance, and was told what it was, in accordance with what it actually is.

As to the representation that the place would support two hundred sheep, it is apparent from the record that, even if any such statement was made by Hilton, Russell did not rely upon it, for, as a sheep-raiser, he not only knew more about his needs than Hilton did, but specifically made it a condition of the deal that

he should have a lease to the adjoining property to be used for pasturage and raising feed. He obtained the lease just as he had requested.

The complaint as to the representation concerning the distance from the land to Dishman is not well founded, for several reasons. In the first place, it is extremely doubtful, from the record, whether any such representation was ever made at all. Certainly, respondent's brief testimony thereon, considered in the light of the actual facts, was not sufficient to establish fraud. The question that Russell evidently had in mind, as disclosed by the complaint and the court's findings, was the location of the nearest trading center. The facts are that *Opportunity* was the nearest trading center and that it is only four miles away, as disclosed to him in the list given him by Hilton. The distance to that point is not disputed.

But beyond all this, if Russell was so vitally interested in distances and location, he had every means to inform himself thereon. He had his own automobile, he had driven to the premises and inspected the same, and his time was at his own disposal. He knew where the village of Dishman was and in what direction from the land it lay. A week elapsed between the time of the trip and the signing of the papers. The simplest precaution on his part would have revealed the actual distance, in mileage, from the land to Dishman.

We are fully convinced that respondent has fallen far short of proving fraud, either by clear and convincing evidence, or even by a preponderance of the evidence.

As to the appellant's counterclaim, little need be said, for nothing in that respect has been urged in her brief. There was absolutely no evidence offered by appellant as to the damages sustained by her because of the breach. The counterclaim must therefore fail.

326

The judgment is reversed, with direction to the trial court to enter judgment dismissing the action of the respondent and also the cross-action of appellant.

ALL CONCUR.