[No. 5746-1-III.   Division Three.   January 29, 1985.]

G M B ENTERPRISES, INC., *Appellant,* v. B-3 ENTERPRISES, INC., ET AL, *Respondents.*

---

*Charles Edwin F. Alden* and *Westland, Liebler, Ivey & Alden,* for appellant.

*Dwight Halstead* and *Halstead & Ingvalson,* for respondents.

THOMPSON, J.—This case involves the application of a state banking statute, RCW 30.12.080(3), to a national bank in a summary judgment proceeding. We affirm.

Gene Bliesner, president and sole shareholder[1] of GMB Enterprises, Inc., was employed as manager of the Sunnyside branch of the Seattle–First National Bank (Seafirst). Delano Arner, a loan officer at the Sunnyside branch, had an agreement with GMB providing that Mr. Arner would receive one–third of the profit from any GMB venture in which he agreed to participate.

In November 1980, B–3 Enterprises, Inc., began the renewal process for its annual farm financing at the Sunnyside branch. Max Benitz, Jr., acting as B–3's secretary, submitted a handwritten budget dated November 10, 1980, to Seafirst. This budget listed B–3's total hop acreage as 230 and projected 1981 income of $1,708,900. On November 14, 1980, B–3 contracted with S. S. Steiner, Inc., to sell its 1981 and 1982 hops. A second budget, typewritten and dated November 25, 1980, listed B–3's hop acres as 200, with the remaining 30 acres rented at an annual rate of $6,000. B–3's projected 1981 income on this budget was $1,124,273. This second budget was approved by Seafirst and B–3 received its farm financing.

On March 16, 1981, GMB and B–3 entered into a 5–year lease of the 30 unimproved acres. The lease provided that the lessor, B–3, was to establish a hopyard on the leased premises and would also manage, oversee, and make all arrangements for farming, harvesting, and marketing the crops produced on the leased premises. In return GMB agreed to pay the actual cost of establishing the hopyard, but was to be reimbursed in a scheduled amount if GMB exercised its right to terminate the lease. Annual rent was set at $6,000. Max Benitz, Jr., and Mrs. Bliesner were sole

---

[1]Mr. Bliesner, with his wife, owns all of GMB's stock.

signers on the lease.

GMB contends the lease was an arm's length transaction and completely unrelated to B–3's operating loan with Seafirst. On the other hand, B–3 claims that Mr. Arner and Mr. Bliesner required B–3 to lease the 30 acres to GMB in order to obtain annual farm financing.

GMB's $34,000 check for hop expenses was deposited in B–3's account at Seafirst on March 24, 1981. Out of Steiner's $205,792.65 payment for the 1981 hop crop, GMB received $82,281.

Sometime thereafter, Max Benitz, Sr., president of B–3, learned of the lease. B–3 sent GMB a notice on April 30, 1982, repudiating the lease. GMB subsequently brought an action to have the lease declared valid and binding upon B–3.

The court determined the lease between B–3 and GMB was a violation of RCW 30.12.080(3)[2] which restricts bank officers and employees from directly or indirectly receiving a benefit from any loan transaction. Because of this violation the court entered judgment against GMB for $45,754.08, which it determined to be GMB's net profit from the lease agreement. We affirm.

GMB appeals the granting of B–3's motion for summary judgment. The trial court and this court must determine whether there is a genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. *Dodd v. Gregory,* 34 Wn. App. 638, 663 P.2d 161 (1983). GMB contends the court erred in determining RCW 30.12.080(3) had been violated since neither Mr. Bliesner nor Mr. Arner received any money, gift or thing of value in

---

[2]RCW 30.12.080 provides in pertinent part:

"A director, officer or employee of a bank or trust company shall not:

". . .

"(3) Receive directly or indirectly and retain for his own use any commission or benefit from any loan made or other transaction had by the corporation, or any pay or emolument for services rendered to any borrower from the corporation or from any person transacting business with it, in connection with the loan or transaction . . ."

procuring a loan for B–3, and that the trial court should not have pierced the corporate veil to find a benefit to Mr. Bliesner in the lease between GMB and B–3.

In 1955, the Legislature enacted RCW Title 30, Banks and Trust Companies, to serve as a comprehensive banking code. *McMurray v. Security Bank,* 64 Wn.2d 708, 716, 393 P.2d 960 (1964) (Hill, J., dissenting). Although it appears no court has construed the language of RCW 30.12.080, the issue of direct versus indirect benefit has been resolved in the context of another banking statute. *State v. Johnson,* 180 Wash. 401, 40 P.2d 159, *appeal dismissed,* 296 U.S. 535, 80 L. Ed. 381, 56 S. Ct. 105 (1935). The *Johnson* court determined the crime of "unlawful borrowing of money from a bank by a director" could be found where the director was also the stockholder and president of the corporation which allegedly received the loan proceeds.

> The object of the statute is not simply to compel obedience to formal requirements, nor is it satisfied with any such compliance. Its purpose is to protect the bank and its depositors against the possible ravages of internal assaults upon its funds. By its very terms, it forbids any loan to be made to any of the directors, officers or employees of the bank, *directly or indirectly,* without a proper resolution authorizing the same having been made; and by a correlative provision, it forbids any officer or director to borrow or knowingly to permit a similar official to borrow any of the bank's funds without such resolution. The statute is, therefore, leveled at indirection as well as at direction. If the forbidden act may not be effected immediately, it may not be permitted to be accomplished circuitously.

*State v. Johnson, supra* at 406–07. *Accord, Hansen v. American Bonding Co.,* 183 Wash. 390, 48 P.2d 653 (1935); *State v. Davies,* 176 Wash. 100, 28 P.2d 322 (1934) (appellant who owned 99 percent of corporate shares could not utilize such corporate entity to evade a legal obligation); *State v. Alexander,* 167 Wash. 15, 8 P.2d 298 (1932); Annot., *Construction and Application of Statutes Prohib-*

*iting or Limiting Loans to Bank's Officers or Directors,* 49 A.L.R.3d 727 (1973). Like the statute which proscribes unauthorized loans to a bank director, RCW 30.12.080(3) provides that a director, officer or employee of a bank shall not receive *directly or indirectly* a benefit from any loan made to a bank customer. Mr. Bliesner's affidavit states that he is sole shareholder and president of GMB. He further admitted that Mr. Arner had entered into an agreement with GMB to receive one–third of the profits of any GMB venture. Thus, the facts of this case fall within the *State v. Davies, supra,* holding.

Even so, GMB contends B–3's loan was procured "months before" the lease was entered; therefore, no relationship exists between the two. We disagree. Federal courts have construed 18 U.S.C. § 215, a similar statute which makes it an offense for bank officers to receive commissions, gifts, or a thing of value for procuring loans, to prohibit "gifts" either before or after the loan. *See Ryan v. United States,* 278 F.2d 836, 838 (9th Cir. 1960); Annot., *Construction and Application of 18 USCS § 215, Punishing Receipt of Commissions or Gifts By Bank Officer for Procuring Loans,* 39 A.L.R. Fed. 704 (1978). We find this rule a logical extension of *State v. Johnson, supra,* which prohibits the circuitous accomplishment of forbidden acts. We therefore hold the lease violated RCW 30.12.080(3).

GMB next argues any violation of RCW 30.12.080(3) does not void the lease. Generally, where a contract

> grows immediately out of, and is connected with, an illegal act, a court of justice will not lend its aid to enforce it. Where a plaintiff, to make a case, must rely upon the illegal contract itself, he cannot recover. . . . A contract which is contrary to the terms and policy of an express legislative enactment is illegal and unenforcible [*sic*].

(Citations omitted.) *Hederman v. George,* 35 Wn.2d 357, 361–62, 212 P.2d 841 (1949); *Vedder v. Spellman,* 78 Wn.2d 834, 480 P.2d 207 (1971); *Waring v. Lobdell,* 63 Wn.2d 532, 387 P.2d 979 (1964); *Springer v. Rosauer,* 31 Wn. App. 418, 641 P.2d 1216 (1982). The benefit Mr. Bliesner obtained in

contravention of RCW 30.12.080(3) is represented by the lease between GMB and B–3; the lease is therefore illegal and unenforceable.

GMB contends RCW 30.12.080(3), by its terms, was not intended to apply to national banks, their directors, officers, or employees based on the Legislature's use of the term "national banking association" in subsection (2) of RCW 30.12.080.[3] GMB concludes that by including this term within subsection (2), the Legislature intended the term "bank", in the context of RCW 30.12.080, to be defined as "any corporation organized under the laws of this state engaged in banking, other than a trust company or a mutual savings bank". RCW 30.04.010.[4] B–3, on the other hand, contends the term "bank" as used in RCW Title 30 varies according to the context of the particular statute, and the statute complements the National Bank Act since the Legislature could not have intended to allow national banks to do that which is expressly forbidden to state banks.

██ ██ "If a statute is susceptible to two interpretations, that interpretation which best advances the overall legislative purpose should be adopted." *Hart v. Peoples Nat'l Bank*, 91 Wn.2d 197, 203, 588 P.2d 204 (1978). The purpose behind the adoption of RCW Title 30, Banks and Trust Companies, was to provide a comprehensive code for banks. *McMurray v. Security Bank, supra* at 716 (Hill, J., dissenting). The purpose behind similar federal legislation was Congress' intention to "remove from the path of bank officials the temptation to enrich themselves at the expense of

---

[3]Subsection (2) provides:

"(2) Become a member of the board of directors of any other bank or trust company or a national banking association . . ."

[4] "30.04.010 Definitions. Certain terms used in this title shall have the meanings ascribed in this section.

". . .

"'Bank,' unless a different meaning appears from the context, means any corporation organized under the laws of this state engaged in banking, other than a trust company or a mutual savings bank."

the borrowers or the bank, and also to prevent improvident loans." *Ryan v. United States, supra* at 838. This purpose is consistent with the development of Washington's banking code and the restrictive language of RCW 30.12.080(3). *See State v. Lindberg,* 125 Wash. 51, 64–65, 215 P. 41 (1923) (statute regulating loans by banks to their officers and directors was intended to protect bank depositors from bank failures). In addition, it has been held that the violation of a state banking law is a violation of a public as well as a private trust. *Hansen v. American Bonding Co., supra* at 396. Another Washington court has construed the term "any bank or trust company", in the context of a banking statute, to include not only domestic banks but also foreign banks authorized to do business within the state. *See Canadian Bank of Commerce v. Johnson,* 150 Wash. 568, 572, 274 P. 99 (1929). We note that at the time this case arose, the banking code contained the same definition of "bank" as found in RCW 30.04.010. Accordingly, we hold RCW 30.12.080(3) applies to national banks.

■ Having determined RCW 30.12.080(3) applies to the facts of this case, we must determine whether federal legislation preempts RCW 30.12.080(3). The United States Supreme Court has stated, "national banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions." *Anderson Nat'l Bank v. Luckett,* 321 U.S. 233, 248, 88 L. Ed. 692, 64 S. Ct. 599, 607, 151 A.L.R. 824 (1944); *accord, McKee & Co. v. First Nat'l Bank,* 265 F. Supp. 1 (S.D. Cal. 1967), *aff'd,* 397 F.2d 248 (9th Cir. 1968); *National State Bank v. Long,* 469 F. Supp. 1068 (D.N.J. 1979), *modified,* 630 F.2d 981, 57 A.L.R. Fed. 308 (3d Cir. 1980); *Pennsylvania Bankers Ass'n v. Commonwealth Bur. of Consumer Protec.,* 58 Pa. Commw. 170, 427 A.2d 730 (1981). A 3–prong test must be satisfied before state legislation may be applied to a national bank. The state law must not

(1) interfere with the purposes of [the banks'] creation,
(2) tend to impair or destroy [the banks'] efficacy as fed-

eral agencies or (3) conflict with a paramount law of the United States. *Pennsylvania Bankers Ass'n,* at 173. *Accord, Pioneer First Fed. Sav. & Loan Ass'n v. Pioneer Nat'l Bank,* 98 Wn.2d 853, 659 P.2d 481 (1983); *Detonics ".45" Assocs. v. Bank of Cal.,* 97 Wn.2d 351, 644 P.2d 1170 (1982).

■ Regulation of banking has been one of dual control between federal and state government since the passage of the first National Bank Act in 1863. "In only a few instances has Congress explicitly preempted state regulation of national banks. More commonly, it has been left to the courts to delineate the proper boundaries of federal and state supervision." *National State Bank v. Long,* 630 F.2d at 985.

18 U.S.C. § 215 applies to banks insured by the Federal Deposit Insurance Corporation, and provides:

> Whoever, being an officer . . . of any bank, . . . stipulates for or receives or consents or agrees to receive any fee, commission, gift, or thing of value, from any . . . corporation, for procuring or endeavoring to procure for such . . . corporation . . . from any such bank . . . any loan . . . shall be fined not more than $5,000 or imprisoned not more than one year or both.

18 U.S.C. § 1 defines the violation of this statute as a misdemeanor. 18 U.S.C. § 215 has as its state counterpart RCW 30.12.110. However, there appears to be no federal counterpart to RCW 30.12.080(3) which makes it a misdemeanor for a bank employee to benefit from a loan which he does not actively procure for the borrower. Conviction under this statute precludes such employee from employment as an officer or official in any state bank. RCW 30.12-.190. The trial court noted this distinction during the hearing on GMB's motion for reconsideration:

> [N]ow, as I analyze those two state statutes and the one federal statute . . ., I came to the conclusion that the state statute made a distinction between the situation where a fellow, such as a bank employee, in fact received a benefit from the loan, which was a misdemeanor, and the situation in which he procured it with an under-

standing that he had received the benefit, which is a felony.

In an analogous situation, the Third Circuit allowed enforcement of the state statute prohibiting redlining against national banks because overlapping federal antidiscrimination legislation did not explicitly prohibit redlining. *See National State Bank v. Long,* 630 F.2d at 982. *Accord, Pioneer First Fed. Sav. & Loan Ass'n v. Pioneer Nat'l Bank, supra,* wherein the court concluded the National Bank Act preempts Washington's Consumer Protection Act only to the extent that an actual conflict exists; thus, a state court may hear a trademark infringement claim relating to the use of the name in a confusing or misleading logo, or advertisement. We conclude federal legislation does not preempt the application of RCW 30.12.080(3) in this case.

Finally, GMB contends the court erred in ordering restitution rather than leaving the parties where it found them.

■ A court may grant relief in both law and equity, *Yount v. Indianola Beach Estates, Inc.,* 63 Wn.2d 519, 525, 387 P.2d 975 (1964). Generally, rescission contemplates restoration of the parties to as near their former position as possible or practical, *Simonson v. Fendell,* 101 Wn.2d 88, 93, 675 P.2d 1218 (1984), and granting rescission is within the court's discretion, *Yount v. Indianola Beach Estates, Inc., supra* at 525.

> To rescind a contract is to declare it void in its inception and to put an end to it as though it never were; to breach a contract implies a violation of a valid and subsisting obligation. When a contract is legally rescinded, the parties are restored to their *status quo* generally . . .

*Russell v. Stephens,* 191 Wash. 314, 315–16, 71 P.2d 30 (1937). GMB further argues the parties are in pari delicto, or B–3 is more at fault.

Ultimately, a decision as to whether a party is in pari delicto relies on public policy considerations and not a neat calculus for determining differential fault. The fundamental concern that should guide a court in making its

decision is whether the "public good [will be] enhanced."
. . .
The key to a determination of this nature is whether our decision will be more likely to prevent such illegal transactions in the future.

(Citations omitted.) *Golberg v. Sanglier,* 96 Wn.2d 874, 883, 639 P.2d 1347, 647 P.2d 489 (1982). If we were to adopt GMB's position, we would be making two statements: first, bank customers who borrow funds from banks are on notice that they may be subject to fraud and deceit without legal recourse; second, bank employees may profit from violating the law with full assurance that they will be insulated from legal recourse since the court will leave the parties where it finds them. We decline to make either statement.

The judgment of the trial court is affirmed.

MUNSON, J., and HOPKINS, J. Pro Tem., concur.

Review denied by Supreme Court May 23, 1985.