714 A.2d 204

The GUARDIAN LIFE INSURANCE COMPANY OF AMERICA

v.

UNITED STATES TOWER SERVICES, LTD., et al.

No. 781, Sept. Term, 1997.

Court of Special Appeals of Maryland.

May 28, 1998.

Reconsideration Denied Aug. 25, 1998.

C. Kevin Kobbe (Kenneth L. Thompson, William L. Reynolds and Piper & Marbury, L.L.P., on the brief), Baltimore, for appellant.

Charles Michael Tobin (Timothy D. Palmer and Hopkins & Sutter, on the brief), Washington, DC, for appellees.

Argued before SALMON, J., and PAUL E. ALPERT and THEODORE G. BLOOM, Judges (retired), Specially Assigned.

SALMON, Judge.

United States Tower Services, Limited (UST), and Joseph Burdette and Norman Jeweler, both trustees of the UST Profit Sharing Plan and Trust and of the UST Pension Plan (the Plan), filed suit in the Circuit Court for Montgomery County against appellant, The Guardian Life Insurance Company of America (Guardian).[1] Plaintiffs alleged in their complaint that Guardian was obligated, under the terms of its insurance contracts and also under the terms of a Maryland statute, to refund to its insureds all premiums paid to it if the insured returned the policy within ten days of its receipt. The complaint further alleged that the Plan, within ten days of the date it received its policies, returned to Guardian's home office all the policies it had purchased from Guardian, but, nevertheless, Guardian refused to refund the premiums. Guardian denied that it owed the Plan any money.

The case was tried before a jury from February 26 to March 4, 1996. At the end of plaintiffs' case and at the end of the entire case, Guardian made a Motion for Judgment, claiming, *inter alia*, that, even if it had technically breached the insurance contracts by failing to refund the past-paid premiums, the Plan had waived the breach. Alternatively, Guardian argued that, as a matter of law, the Plan was equitably estopped from asserting a right to the premiums. The motions for judgment were denied, and the jury returned a verdict in favor of the Plan in the amount of $204,428.71. This figure was calculated by totaling the premium payments made by the Plan from November 1987 to February 1992. After filing a motion for judgment notwithstanding the verdict, which was denied, Guardian filed this timely appeal. It raises several issues, but we need address only two:[2]

---

**1.** Appellees also sued David Kenny, an agent of The Guardian Life Insurance Company, and National Pension Services, Inc. Mr. Kenny was dismissed from the case prior to trial and is not involved in this appeal.

**2.** The issues as framed by appellant were:

1. As a matter of public policy, can an insured by its conduct waive the right to a premium refund that is granted by Maryland Code Annotated (1994 Repl.Vol.), article 48A, section 387C?

2. Assuming, *arguendo*, that the provisions of article 48A, section 387C, can be waived, did appellees waive their right to a premium refund by their conduct after appellees demanded a refund?

We answer both questions in the affirmative and reverse.

## A. FACTS [3]

UST, a small company located in Rockville, Maryland,[4] is in the business of erecting and maintaining communication towers for cellular telephones, radio stations, television stations, the United States military, and microwave systems. UST's employees engage in dangerous work. Many are required to climb towers even during inclement weather. It was impor-

---

I. Did the circuit court err in denying Guardian's motion for judgment on grounds that the plaintiffs' claim was barred by the statute of limitations where the plaintiffs knew of their right to return the insurance policies under the 10–day free look provision more than three years prior to the filing of their complaint?

II. Did the circuit court err in denying Guardian's motion for judgment on grounds that the plaintiffs' claim was barred by waiver where the plaintiffs received the full benefit of the insurance policies both before and after their demand for a refund of policy premiums?

III. Did the circuit court err in denying Guardian's motion for judgment on grounds that the plaintiffs' claim was barred by estoppel where the plaintiffs received the full benefit of the insurance policies both before and after their demand for a refund of policy premiums?

IV. Did the circuit court err in denying Guardian's motion for judgment on grounds that Guardian's breach of the 10–day free look provision of the insurance policies was not a material breach?

**3.** The facts set forth in this opinion are in the light most favorable to appellees. Maryland Rule 2–519(a). Guardian, at trial, disputed many of those facts.

**4.** At the time of trial, UST had fewer than twenty employees.

tant to some of UST's employees that the company purchase life insurance.

Sometime in 1987, representatives of UST contacted David Kenny, an agent of Guardian, to inquire about purchasing life insurance as part of the company's pension plan. In late 1987, Mr. Kenny persuaded the Plan to purchase life insurance policies from Guardian. The policies that were purchased insured the lives of Joseph Burdette (Burdette), Norman Jeweler (Jeweler), and six other employees of UST. As already mentioned, Burdette and Jeweler were Trustees of the Plan. The policies insuring Burdette and Jeweler were whole life policies providing $1,000,000 in life insurance. The other policies were five-year automatic convertible term policies. The policies funded the Plan.

Each of the policies contained what is known as a "ten-day free look provision," which read as follows:

**READ THIS POLICY CAREFULLY**: This policy is a legal contract between the owner and Guardian. If this policy is returned to Guardian's home office or to any agent or agency within ten days after it is received, all premiums paid will be refunded. The policy will be void from the beginning.

At the time of the application for the policies, Kenny told representatives of the Plan that after the policies were issued that the trustees and their advisers would have an opportunity to examine the policies to see if each of the policies met with their approval. Kenny specifically assured the trustees that if, after examination, the Plan was dissatisfied, then the policies could be canceled.

After the policies were issued, Kenny told Burdette that he intended to keep the originals of the policies in case he was contacted by any of the professionals hired by UST to evaluate the Plan. This arrangement was not agreeable to Burdette. Burdette, in 1988, told Kenny that he wanted the originals of the policy to be delivered to him. Thereafter, the Plan made numerous unsuccessful written and oral demands to Kenny to obtain the policies.

■ The policies consisted of two parts. Part A set forth information particular to each insured. Part B contained boilerplate provisions that were the same for every policy of a particular type. The ten-day free look provision was in Part A. Although appellees never received the entire policies prior to 1992, they did receive Part A in early 1988, and by at least 1990 the appellees had in their possession a copy of the insurance binders for the various policies. Finally, after much effort on the part of the trustees and their lawyers, Guardian delivered to appellees "duplicate" policies [5] in February 1992.[6]

Within ten days of receipt of the duplicate policies and on February 27, 1992, Jeweler, who was President of UST, wrote to Guardian and demanded a full refund of the more than $200,000 in premiums (five years' worth) paid to Guardian; he also returned the policies in accordance with the "free-look" provision of the policies. On February 28, 1992, Guardian refused to accept the policies and also refused to refund any of the premiums paid by appellees.

In a letter dated March 24, 1992, Guardian spelled out its position to Jeweler. First, Guardian said that its agent, Kenny, had "indicated [to it] that the policies in question were, in fact, delivered" to either Burdette or Jeweler soon after they were issued and that he (Kenny) was "at a loss" to explain appellees' claim that the policies had not been received. Guardian also asserted that "other factors indicated that appellees were aware of the coverage they had." Guardian listed those other factors as follows:

First, the policies were in force 5 years before you contacted the Home Office. In addition,

(a) Premiums were paid in full during this period.

(b) The plan was maintained as a qualified [pension] plan [for IRS purposes].

---

**5.** Duplicate policies, in the parlance of the insurance industry, are not mere copies; they are more in the nature of replacement original policies.

**6.** Two of the original eight policies were canceled in 1990.

(c) Tax deductions were taken based on the insurance premium.

(d) All policies in question did provide death benefits which would have been paid in the event of death.

Appellees filed their complaint in the Circuit Court for Montgomery County on July 10, 1992, to enforce their right to the refund.

Despite the fact that the appellees had attempted in February 1992 to void the policies and obtain a refund of all monies paid through February 27, 1992, UST thereafter continued to make premium payments to Guardian on four of the six policies but not on the policies insuring Burdette and Jeweler. On each of its premium payment checks, appellees wrote the words "under protest." On December 11, 1992, the policies covering the lives of Burdette and Jeweler lapsed for nonpayment of premiums. But in March of 1993, appellees applied for reinstatement of these whole life policies and Guardian reinstated them. Thereafter, appellees regularly made premium payments due for all of the policies.

At trial, Jeweler testified that as a trustee of the Plan he applied for reinstatement of the policies in order to protect "a tremendous amount of money that belong[ed] to the pension plan." On a related subject, Burdette testified that he did not cancel the policy after February 27, 1992, because he feared that cancellation might be a "financial" mistake.

Q. [Guardian's Counsel:] Why didn't you cancel the policies?

A. [Mr. Burdette:] Well, the policies were probably cancelable, I guess. I've learned that. We wouldn't have canceled them because they were an investment vehicle in the pension plan and we were trying to oversee the pension plan. They also were security for the workers and myself.

\*       \*       \*

The insurance policy gains cash value not very rapidly in the first year or two, and we had already passed that milestone. So switching insurance or—or canceling insurance after you've passed the first years may very well be a

financial mistake, perhaps the best thing I just could conjecture.

In response essentially to the same question, Jeweler testified:

A. Well, we had paid money in, we had insurance. We felt relatively comfortable that there was insurance in place and we paid a lot of money for that insurance, and that's what we wanted, we wanted the insurance, it was part of the pension plan.

At the time of trial, four years after the attempt to cancel by the Plan, the appellees still regularly paid the premiums on the policies, continued to accept policy dividends from Guardian, continued to take federal income tax deductions for the monies paid to Guardian for the insurance, and enjoyed the financial protection afforded by the policies.

## B. ISSUE 1

Appellees contend that under no circumstances may an insured waive enforcement of the ten-day free look provision. Maryland Code (1957, 1994 Repl.Vol.), Art. 48A, § 387C,[7] provides:

**Information to be attached or printed on face of policy or contract.**

(a) *Required information.*—Each life insurance policy or annuity contract subject to this subtitle shall have attached or prominently printed on the face of the policy or contract the following information:

(1) A notice to the policyholder that, during the period of ten days from the date the policy or contract is delivered to the policyholder, it may be surrendered to the insurer for cancellation, and a pro rata premium for the unexpired term of the policy shall be returned to the policyholder. The notice shall be given to the insurer in writing; or

---

7. Former section 387C is now found in Md.Code (1997), § 16–105 of the Insurance Article. Although the wording was modified, the new provision is without substantive change.

(2) A notice to the policyholder which is similar to the notice contained in paragraph (1) and which, in the opinion of the Commissioner, is not less favorable to the policyholder.

(b) *Application of section.*—The section shall not apply to policies or contracts issued to an employee in connection with the funding of a pension, annuity or profit-sharing plan, qualified or exempt under, § 401, § 403, § 404, or § 501 of the Internal Revenue Code if participation in the plan is a condition of employment.[8]

■ Article 48A, section 377(d),[9] which governs section 387C, states that "[n]o such [mandatory] provision, if required to be contained in the policy, can be waived by *agreement* between the insurer and any other person." (Emphasis added.)

The appellees posit that even if they had intended to do so they could not, by their actions or failure to act, have waived a provision of a statute such as section 387C, which is founded upon public policy.[10] We do not agree with this proposition because if the Legislature had wanted to prevent waiver by act or conduct of the insured it would have said so, as it has done in the past. *See, e.g.,* Md.Code (1957, 1995 Repl.Vol.),

---

**8.** Here, the policies were not issued directly to the employees.

**9.** Former section 377(d) is now found in Md.Code (1997), § 12–102(b)(2) of the Insurance Article. Although the wording was modified, this new provision is without substantive change.

**10.** Although the ten-day free look provision of the Guardian policies was undoubtedly inserted due to section 387C, the Guardian policy language provides the insured with far more than what is required by the statute. The policies allow the insured to receive back the entire premium within ten days of the receipt of the policy, whereas section 387C mandates only a pro rata return of the premium. If the policy language had mirrored the statutory language set forth in section 387C(a)(1), insured such as appellees would be entitled only to the return of the unearned portion of the premiums that represented the cost of future insurance. This would be a small fraction of what appellees were awarded by the jury. Under the ten-day free look provision of the policies issued to the Plan, however, the insured was entitled to receive back the earned portion of the premiums.

Art. 70B, § 16 ("No act, agreement, or statement ... shall constitute a valid waiver...."); Md.Code (1975, 1990 Repl. Vol.), § 12–512 of the Commercial Law II Article ("No act, agreement, or statement ... may constitute a valid waiver...."). Instead of prohibiting all types of waiver, section 377 prohibits only waiver by agreement. From the inclusion of one type of waiver, we infer the exclusion of any other type—*inclusio unius est exclusio alterius* (inclusion of one is the exclusion of another). This principle was explained in *Dodds v. Shamer*, 339 Md. 540, 554, 663 A.2d 1318 (1995), a case involving the issue of whether a liquor license in Baltimore County was subject to levy under a writ of execution. Maryland Code (1957, 1998 Repl.Vol.), Art. 2B, § 10–501, provides that liquor licenses in Prince George's, Worcester, Howard, and Harford Counties were specifically shielded from execution by creditors. The *Dodds* Court said:

> We will not infer from the absence of explicit provisions that the statute extends the rule in the four named counties to the entire State. *See Slate v. Zitomer*, 275 Md. 534, 540 [341 A.2d 789] (1975) ("[C]ourts may not 'attempt under the guise of construction, to supply omissions or remedy possible defects in the statute, or to insert exceptions not made by the Legislature.'") (citing *Amalgamated Casualty Ins. Co. v. Helms*, 239 Md. 529, 535–36 [212 A.2d 311] (1965)), *cert. denied, Gasperich v. Church*, 423 U.S. 1076, 96 S.Ct. 862, 47 L.Ed.2d 87 (1976). Had the General Assembly intended to exempt liquor licenses from writs of execution throughout the State, it could have done so just as it did for the four named counties. Following the doctrine of *inclusio unius est exclusio alterius*, we find that by specifically exempting liquor licenses from execution in Prince George's, Worcester, Howard, and Harford Counties the General Assembly did not intend also to exempt liquor licenses from execution in the rest of the State. *American Security & Trust Co. v. New Amsterdam Casualty Co.*, 246 Md. 36, 41 [227 A.2d 214] (1967) (concluding that because the Legislature had not included mortgagees within the terms of a

statute that they were purposely excluded from the statute's reach).

*Dodds,* 339 Md. at 554, 663 A.2d 1318 (footnote omitted).

Several Maryland cases show that statutory provisions, analogous to section 387C of the Insurance Code, can be waived by the conduct of the person the law was designed to protect. *See, e.g., Hudson v. Maryland State Housing Co.,* 207 Md. 320, 329–30, 114 A.2d 421 (1955) (vendee waived right to rescind land installment contract despite technical deficiencies under Land Installment Contract Act); *Mercedes–Benz of N.A., Inc. v. Garten,* 94 Md.App. 547, 564–65, 618 A.2d 233 (1993) (car buyer waived right to a refund of purchase price under Automotive Warranty Enforcement Act); *Bagel Enter., Inc. v. Baskin & Sears,* 56 Md.App. 184, 200, 467 A.2d 533 (1983)(franchisees waived right to rescind a contract to purchase franchise rights sold in violation of the Franchise Registration Act), *cert. denied,* 299 Md. 136, 472 A.2d 999 (1984).

## C. ISSUE 2

Appellant contends, *inter alia,* that by appellees' action, after February 1992 when the Plan demanded a refund, it waived its rights to a cancellation of the policies and a return of all premiums paid prior to February 1992. Appellant points out that there was no dispute as to what appellees' actions were after February 1992, and in such circumstances, the trial judge should have granted its motion for judgment at the conclusion of all the evidence, based on the waiver defense. The waiver issue troubled the trial judge, who said, in denying appellant's motion for judgment:

> [These waiver arguments give] the [c]ourt more pause than any other ground that has been alleged as a basis for a motion for judgment, and the [c]ourt is not, frankly, certain which argument is correct. The [c]ourt understands the realities of life that were stated by the plaintiff as for reason that they took what I will call seemingly inconsistent positions after 1992, but sometimes the realities of life and the legal precepts that we live under come afoul and when that

occurs the legal precepts prevail, but I am not sure which legal precepts prevail.

What comes to my mind is that we have been through five days of trial. This case likely will be appealed in any event, whichever way it comes out, anyway, but if it is, I would prefer that it be appealed after a jury verdict, and so that if there is a jury verdict available, it may stand and not have to have this case retried.

Appellant took the position below and here on appeal that appellees' inconsistent positions waived their right to rescind the policies. Citing *Kemp v. Weber*, 180 Md. 362, 24 A.2d 779 (1942), and several other cases, appellant maintains that a party waives his right to rescind a contract by continuing to perform, or continuing to treat the contract as a subsisting obligation, after the party becomes aware of facts that would justify rescission. Appellees counter by arguing: (1) the question of whether a party waived his/her contract rights is generally one to be decided by the trier of fact, *University National Bank v. Wolfe*, 279 Md. 512, 523, 369 A.2d 570 (1977), and here the jury decided the waiver issue against appellant; (2) even if the jury verdict is disregarded, appellees never sought a rescission of the contract, but instead sought a "statutory cancellation"; and (3) "even assuming the rules of rescission apply, [a]ppellees did not waive [their] right to rescind."

■ Before addressing the substantive issue of whether there was a waiver, we shall address the first two of appellees' arguments. It is true that the issue of waiver was addressed by the jury and that the jury resolved the waiver issue against appellant. But mere reliance upon the jury verdict avoids the question raised by appellant as to whether the issue should have been sent to the jury in the first place. The waiver issue should have been decided by the court and not the jury if, taking the evidence (and all reasonable inferences that can be deduced from that evidence) in the light most favorable to appellees, there existed no material dispute of facts concerning appellees' actions once they received the duplicate policies in

late February 1992. Appellant asserts that there were no such material disputes of facts; appellees have pointed to none; and we have been unable to discern any. Therefore, the fact that the jury found no waiver, standing alone, does not necessarily mean that appellees' rights were not waived.

■ As already mentioned, appellees contend that in their complaint they never asked the court to rescind the insurance policies but instead asked for "statutory cancellation." Although appellees do not explicitly say so, the apparent reason they seek to disavow any intent to rescind the policies is to avoid the precedential value of several cases, cited by appellant, dealing with the waiver defense in suits brought for rescission. But whatever the reason, the legal distinction between "rescission" and a "statutory cancellation" that voids the policy is a distinction that eludes us. Under section 387C, a party has ten days from receipt of the policy to "cancel" the policy. The words "cancel" and "rescind," in this context, are synonymous. *See Black's Law Dictionary* 1306–07 (6th ed.1990), which states:

> **Rescission of Contract.** To avoid, or *cancel* a contract; particularly, nullifying a contract by the act of a party. The right of rescission is the right to cancel (rescind) a contract upon the occurrence of certain kinds of default by the other contracting party. To declare a contract void in its inception and to put an end to it as if it never were. *Russell v. Stephens*, 191 Wash. 314, 71 P.2d 30, 31. A "rescission" amounts to the unmaking of a contract, or an undoing of it from the beginning, and not merely a termination, and it may be effected by mutual agreement of parties, or by one of the parties declaring rescission of contract without consent of other if a legally sufficient ground therefor exists, or by applying to courts for a decree of rescission. *Abdallah, Inc. v. Martin*, 242 Minn. 416, 65 N.W.2d 641, 644. It necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it. Nonetheless, not every default in a contract will give rise to a right of rescission. *See also* Cancellation; Renunciation; Repudiation; Revocation; Termination.

An action of an equitable nature in which a party seeks to be relieved of his obligations under a contract on the grounds of mutual mistake, fraud, impossibility, etc.

(Emphasis added.) As can be seen, the legal effect of appellees' request for cancellation was to ask that the insurance contracts be rescinded.

■ This brings us to the central issue in this case, viz:

Did appellees waive their right to rescind the contract by their actions after February 27, 1992?

As the Court of Appeals said in *BarGale Industries, Inc. v. Robert Realty Co.*, 275 Md. 638, 643–44, 343 A.2d 529 (1975):

A waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances. "[A]cts relied upon as constituting a waiver of the provisions" of a contract must be inconsistent with an intention to insist upon enforcing such provisions. *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 360 [322 A.2d 866] (1974); *Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 531 [200 A.2d 166] (1964).

The post-February 1992 actions relied upon by appellant to show a waiver are:

(1) A request by appellees to reinstate two of the policies in March 1993;

(2) Acceptance by appellees of policy dividends paid by the appellant;

(3) Regular payments by appellees to appellant of premiums due on the policies; and

(4) Appellees' continued enjoyment of the life insurance protection afforded by the policies.

In Maryland, it is well established that a party cannot on the one hand demand that a contract be rescinded and on the other hand treat the contract as if it were in effect. This was explained in *Bagel Enterprises*, 56 Md.App. at 200, 467 A.2d 533:

The right to rescind may be waived by "continuing to treat the contract as a subsisting obligation." *Michael v. Towers,* 253 Md. 114, 117 [251 A.2d 878] (1968), quoting *Kemp v. Weber,* 180 Md. 362 [24 A.2d 779] (1942). "If a party who knows the facts which would justify rescission, does any act *which recognizes the continued validity of the contract or indicates that he still feels bound under it,* he will be held to have waived his right to rescind." *Lazorcak v. Feuerstein,* 273 Md. 69, 76 [327 A.2d 477] (1974). A useful discussion of the choice facing a party who has a right of rescission is found in *Kemp v. Weber, supra,* 180 Md. at 366 [24 A.2d 779]:

All the authorities hold that such choice must be exercised as soon as the party ascertains the facts, and is informed of the failure on the part of the other party. The reason for this is clear. Having then a knowledge of the facts, he is not deceived. If he is unwilling to take the benefits accrued or accruing under the contract, he has an opportunity to disavow it, get back what he had put out, and place himself in approximately the same position in which he would have been had no contract been made. If he does not do this, but continues receiving the benefits coming to him under the contract, he has affirmed the contract after knowing the facts. He may have been deceived in the first instance, but he is not deceived after he knows. Making his choice after he knows, he must abide by it. [Citations omitted].

(Emphasis added.) *See also Prince George's County v. Silverman,* 58 Md.App. 41, 59, 472 A.2d 104 (1984) (Prince George's County waived the provision of an option contract, which provided that if the County did not accept the optionee's bid within 45 days, the option contract was null and void because, after 45 days had elapsed, the County continued to treat the option contract as if it were a subsisting obligation).

In the case *sub judice,* the appellees appeared to want to have five years worth of premiums returned and at the same time to keep the policies in effect. The strongest illustration of appellees' inconsistent positions was the Plan's request, in

March 1993, that two of the policies be reinstated. The reason the trustees did not cancel the policy after February 1992 was, in Mr. Jeweler's words, "We felt relatively comfortable that we had insurance in place ... and that's what we wanted, we wanted the insurance...." Appellees reaped the benefits of the policy after February 1992 by receiving the intangible benefits of having valid life insurance in effect and by accepting dividends from those policies. As shown by the testimony of appellees' own insurance expert, if any of the six employees covered by Guardian policies had died after February 1992, appellant would have been obligated to pay the Plan the policy amount. Instead of disavowing the policies, the Plan treated the policies as if they were still in effect.

Appellees contend that the "under protest" notation on its premium checks "made it clear to [a]ppellant that they did not recognize 'the continued validity of the contract' or feel 'bound under it.'" We disagree. If the policies were void, appellees were under no obligation to send *any* premium check. If appellees wanted to show that they considered the policies void they should have stopped paying premiums and proceeded with their lawsuit. One cannot "retain the benefits [of a contract] and get back his expenditures. He would then be receiving a free gift[11] of whatever he got under the contract." *Kemp*, 180 Md. at 366, 24 A.2d 779.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY WITH DIRECTION TO ENTER JUDGMENT IN FAVOR OF GUARDIAN LIFE INSURANCE COMPANY OF AMERICA; COSTS TO BE PAID BY APPELLEES.**

---

11. Appellees contend that they received no "free gift" under the policies because they continued to pay premiums after February 1992. This argument is disingenuous. Appellees paid premiums on policies that, in 1992, were five years old; if appellees had attempted to get new life insurance policies in 1992, with all six insured having advanced five years in age, premiums undoubtedly would have been higher, and as Mr. Burdette testified, a new policy would not gain cash value as fast as the existing policy.