**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| SERPANOK CONSTRUCTION, INC., a Washington corporation, | No. 54413-0-II (consolidated with No. 54833-0-II) |
| Respondent, | |
| v. | |
| POINT RUSTON, LLC, a Washington limited liability company; POINT RUSTON PHASE II, LLC, a Washington limited liability company; CENTURY CONDOMINIUMS, LLC, a Washington limited liability company; and MICHAEL A. COHEN,[†] an individual, | |
| Appellants, | |
| CHICAGO TITLE INSURANCE COMPANY, a foreign corporation; ADDISON CONSTRUCTION SUPPLY, INC., a Washington corporation; JM CORP & SON, INC., a Washington corporation; GLACIER NORTHWEST, INC. d/b/a CALPORTLAND, a Washington corporation; RICHARD MATZEN and EDELGARD MATZEN, husband and wife, and the marital community comprised thereof; C2 STRATEGIES, LLC, a Washington limited liability company; STACEY POLAND and SHERI POLAND, a married couple; USAA FEDERAL SAVINGS BANK, a federal savings association; FIRST AMERICAN TITLE INSURANCE COMPANY, a foreign corporation; INTERNATIONAL FIDELITY INSURANCE COMPANY, a foreign corporation; STONER ELECTRIC, INC., a foreign corporation, | PART PUBLISHED OPINION |
| Defendants. | |

---

[†] Michael Cohen passed away on December 6, 2020.

GLASGOW, A.C.J.—Point Ruston LLC, Point Ruston Phase II LLC (Phase II), and Century Condominiums (hereinafter collectively referred to as Point Ruston parties) were separate but related real estate companies developing the Point Ruston area in Pierce County. Serpanok Construction Inc. was a concrete and steel construction subcontractor on the project.

Phase II and Century fell behind in payments to Serpanok. Point Ruston LLC then guaranteed a portion of Phase II and Century's debt to induce Serpanok to keep working. Serpanok also filed a mechanic's lien on a parking garage it was constructing.

Serpanok then sued the Point Ruston parties for breach of contract due to failure to pay. An arbitrator awarded Serpanok over $4.6 million (before attorney fees and interest). The arbitrator limited the total recovery from all defendants to the total amount due under the subcontracts and granted Serpanok's request to foreclose on the garage mechanic's lien. The arbitrator collectively awarded the Point Ruston parties $1.2 million (before attorney fees and interest), comprised of a sanctions award and recovery for its successful counterclaims against Serpanok.

The trial court confirmed the arbitration award, entering a total judgment of approximately $5.2 million (including prejudgment interest) against the three Point Ruston parties, who were jointly and severally liable. Serpanok then foreclosed on its mechanic's lien and purchased the garage at the sheriff's sale with a credit bid of $3.4 million. The trial court adhered to the arbitrator's determination that the total payment from all Point Ruston parties could not exceed the $5.2 million owed under the subcontracts plus interest and fees. The trial court confirmed the foreclosure sale, determined that the sale proceeds fully satisfied the mechanic's lien, and reduced the total underlying debt, as well as Point Ruston LLC's guaranty obligation, to a remaining balance of $1.8 million.

The Point Ruston parties appeal the arbitration award and related orders. The Point Ruston parties also appeal the postjudgment allocation of foreclosure sale proceeds, claiming the trial court erred by not subtracting the $3.4 million foreclosure sale proceeds from Point Ruston LLC's guaranty and releasing Point Ruston LLC entirely from its obligations as a guarantor. Both the Point Ruston parties and Serpanok request attorney fees on appeal.

In the published portion of this opinion, we affirm the allocation of foreclosure sale proceeds. Point Ruston LLC remains a secondary obligor liable for the remaining $1.8 million balance on the underlying debt. In the unpublished portion of this opinion, we affirm the underlying arbitration award and reject the Point Ruston parties' other claims. Therefore, we affirm both the arbitration award, as well as the trial court's allocation of foreclosure proceeds and judgment. We grant Serpanok's request for attorney fees on appeal.

FACTS

A.    Background

The Point Ruston parties constructed apartment buildings, condominiums, retail businesses, a movie theater, a parking garage, and other structures on the site of the former Asarco copper smelter. Michael Cohen was the project manager. Larry Hutchinson was the construction manager and oversaw the Point Ruston projects from 2013 to 2015. Hutchinson negotiated subcontracts, approved change orders, was authorized to "exercise discretion and independent judgment," and owed the Point Ruston parties fiduciary duties. Clerk's Papers (CP (I))[1] at 1472.

---

[1] The clerk's papers in cause no. 54413-0-II are referred to as "CP (I)." The clerk's papers in cause no. 54833-0-II are referred to as "CP (II)."

In 2014, Phase II and Serpanok signed subcontracts for the movie theater (Building 1A) and the parking garage.[2] Both subcontracts had arbitration clauses. Shortly after the signing of the Building 1A subcontract, title of that building was transferred to Century, making it the real party in interest. Century was not a party to the garage subcontract, and Point Ruston LLC was not a party to either subcontract.

B.     Kickbacks, Change Orders, and Promissory Notes

From 2013 to 2015, Serpanok paid Hutchinson about $80,000 in kickbacks in exchange for information that would assist Serpanok in obtaining contract awards and change order decisions favorable to Serpanok. The Point Ruston parties learned of Hutchinson's misconduct in November 2015, investigated possible claims against Hutchinson and Serpanok, and fired Hutchinson. Phase II nonetheless executed additional change orders with Serpanok after terminating Hutchinson. Phase II also "insist[ed] that Serpanok continue to perform under the subcontracts, [and] accept[ed] the valuable work . . . by Serpanok." CP (I) at 2746. Serpanok completed all of its "work for competitive prices (or better)." CP (I) at 2766. And even after discovering the misconduct between Serpanok and Hutchinson, Cohen praised Serpanok for the speed and quality of its work.

Phase II continued to fall behind in payments, owing more than $2 million for Serpanok's work on the garage by spring 2015. To persuade Serpanok to continue working, Point Ruston LLC (a separate entity from Point Ruston Phase II, the entity directly contracting with Serpanok), issued two promissory notes to Serpanok guaranteeing the amounts due under the subcontracts. Serpanok

---

[2] When reviewing an arbitrator's award, courts are "bound by the arbitrator's findings of fact." *Int'l Union of Operating Eng'rs, Local 286 v. Port of Seattle*, 176 Wn.2d 712, 724, 295 P.3d 736 (2013). As a result, our recitation of the facts tracks the arbitrator's findings.

also filed a mechanic's lien on the garage worth approximately the amount it was owed under the garage subcontract.

Serpanok stopped working on the garage in May 2016 because the Point Ruston parties refused to execute a change order authorizing additional work. Serpanok left behind some construction equipment at the site that could not be safely removed. The equipment was later returned to Serpanok.

C.    Complaint, Counterclaims, and Affirmative Defenses

In late 2016, Serpanok sued the Point Ruston parties and Cohen, alleging that Phase II breached the Building 1A and garage subcontracts by failing to fully pay Serpanok for its work. Serpanok also brought a conversion claim against Phase II and Cohen, claiming they improperly possessed and refused to return Serpanok's construction equipment. Additionally, Serpanok sought foreclosure of the mechanic's lien on the garage.

In the answer, the Point Ruston parties denied all of Serpanok's claims and asserted affirmative defenses and counterclaims, including a fraud counterclaim, an affirmative defense of illegality, and other counterclaims alleging Serpanok aided and abetted Hutchinson in breaching his fiduciary duties, breached the duty of good faith and fair dealing, and violated Washington public policy. Concerning the fraud counterclaim, the Point Ruston parties argued that "they were the victims of a fraud perpetrated by [Serpanok] and Mr. Larry Hutchinson" in which "Serpanok made secret and improper payments to Mr. Hutchinson in return for his assistance" and they "reasonably relied on the fraud and suffered damages." CP (I) at 2736-37. The illegality defense alleged the subcontracts, change orders, and notes were unenforceable because they were the product of the illegal kickback scheme between Serpanok and Hutchinson. The Point Ruston

parties also sought disgorgement of Serpanok's profits, an award equal to the amount of the kickback payments and "the compensation . . . paid to Mr. Hutchinson," and a "refund [of] all of the payments made under the Notes." CP (I) at 2737.

The Point Ruston parties successfully moved to compel arbitration under the subcontracts. Although Cohen did not sign the subcontracts, the trial court found he was subject to the arbitration clauses because he was the Point Ruston parties' agent.

D.      Arbitration Hearing and Interim Award

During the arbitration hearing, Serpanok's owner, Igor Kunitsa, misinformed all counsel and the arbitrator about the information captured in Serpanok's bookkeeping records regarding the kickbacks. It became clear that he had not provided complete records in response to discovery requests. Kunitsa then tried to alter records to conceal damaging information about the kickback payments to Hutchinson.

The arbitrator entered an interim decision setting forth "the principal reasons for the relief awarded." CP (I) at 362. The arbitrator deemed the kickback scheme "deplorable," CP (I) at 365, and found that Serpanok aided and abetted Hutchinson's breach of his fiduciary duties, but concluded, "The evidence presented did not prove by 'clear, cogent, and convincing evidence' that the two subcontracts were fraudulently induced" or that fraud occurred later, during the "change order/performance phases of the two subcontracts, either before or after Mr. Hutchinson's termination," CP (I) at 362. The Point Ruston parties failed to meet the elements of fraud because "[t]he evidence did not establish that the terms of the two Serpanok subcontracts, as originally executed, damaged [them] by requiring them to pay a higher price for the specified work than they could have obtained by contracting with a different subcontractor." CP (I) at 363. The arbitrator

6

found there was no "non-speculative" evidence that the Point Ruston parties had any "then-available options with other willing contractors to do the specified work for less." *Id.*

The arbitrator also found that the two promissory notes were "intended to persuade Serpanok to keep working despite the fact that payments to Serpanok at the time under the subcontracts were massively late (over $2 million in arrears on each subcontract at the time Note 2 was issued)." CP (I) at 373. Because "the Notes . . . were issued as guaranties," obligating Point Ruston LLC to pay the amounts due under the subcontracts if Phase II and Century failed to do so, the arbitrator concluded that "the 'economic reality' of the Notes transactions was that they were not intended as investments by the parties but rather were entered into as ancillary components of ordinary 'commercial transactions' - i.e., were intended to assure complete payment of construction subcontract invoices already due to the Subcontractor." *Id.* (emphasis omitted).

The arbitrator concluded that Serpanok had established its breach of contract claims arising from the subcontracts and notes. The arbitrator rejected Serpanok's tortious conversion claim because Phase II and Cohen only temporarily possessed the construction equipment until it could be safely removed.

The arbitrator rejected the Point Ruston parties' affirmative defenses and all but two counterclaims. The arbitrator did not find that Serpanok breached its duty of good faith and fair dealing because, based on the totality of the evidence presented, the Point Ruston parties failed to establish that the alleged breach of the duty of good faith and fair dealing proximately caused them any recoverable damages with respect to the work provided under the subcontracts. The arbitrator rejected the Point Ruston parties' public policy tort counterclaim primarily because "it has not

been clearly established that Washington law recognizes the existence of the 'public policy torts' on which this counterclaim depends." CP (I) at 378.

The arbitrator did find, however, that the Point Ruston parties prevailed on two counterclaims—the claim that Serpanok aided and abetted Hutchinson's breach of his fiduciary duties and the claim based on a lien improperly filed on Building 1A. The arbitrator also found that "Kunitsa engaged in an improper act of spoliation of evidence and related discovery abuse," entitling the Point Ruston parties to a sanctions award. CP (I) at 379.

E.      The Point Ruston Parties' Motion for Reconsideration and Final Arbitration Award

The Point Ruston parties filed a motion for reconsideration, which the arbitrator denied in a final award that incorporated and copied much of the interim award verbatim. In particular, the Point Ruston parties asserted the interim award erroneously rejected its illegality defense and should have instead concluded that the subcontracts could not be enforced because they violated public policy.

The arbitrator again denied the Point Ruston parties' illegality affirmative defense because they "did not establish that [they] overpaid for the two subcontracts, or the change orders, or the Notes." CP (I) at 2766. The arbitrator reasoned that the Point Ruston parties "failed to prove that [Serpanok's and Hutchinson's] misconduct . . . fraudulently induced or otherwise caused the parties to enter" any of the agreements, and "similarly failed to prove that the misconduct proximately caused actionable contract overpayments, improper work, or the like." CP (I) at 2765. The arbitrator held, "The damages . . . on the aiding and abetting counterclaim must be limited to the damages actually proven to have been caused by that misconduct, all of which were confined to Mr. Hutchinson's employment relationship with his employer." *Id.*

8

The arbitrator separately concluded that declining to enforce the contracts entirely would have been "neither just nor equitable," and the arbitral rules the parties agreed to authorized him to "'grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties.'" CP (I) at 2767 (quoting Am. Arbitration Ass'n, Commercial Arbitration Rules and Mediation Procedures R-47(a) (Oct. 1, 2013), https://adr.org/sites/default/files/CommercialRules_Web-Final.pdf. (Rule R-47(a)). The arbitrator observed that the Point Ruston parties "aggressively and repeatedly" insisted that Serpanok finish construction even after discovering Hutchinson's misconduct, so it would be unfair to permit the Point Ruston parties "to escape their duty to pay for millions of dollars worth of valuable work done on their buildings in accordance with the parties' contracts." CP (I) at 2766.

Under the final arbitration award, Serpanok received a total award of approximately $4.6 million, based on the subcontracts, the guaranty/notes, and the garage mechanic's lien. For the subcontract-based awards, Serpanok received $4,646,062 (comprised of $3,426,303 against Phase II under the garage subcontract and $1,219,759 against Century and Phase II under the Building 1A subcontract). For the guaranty/notes awards, Serpanok received a total of $2,184,039 against Point Ruston LLC (comprised of $895,311 under Note 2 and $1,288,728 under Note 3). And for the garage mechanic's lien award, Serpanok was awarded $3,178,179 against Phase II.

The guaranty/notes and the lien provided alternative avenues for recovery, so the arbitrator clarified that Serpanok's total relief under all the awards could not exceed the approximately $4.6 million it was owed under the two subcontracts, plus attorney fees and costs, arbitration expenses, and postjudgment interest.

The arbitrator also awarded damages to the Point Ruston parties on three counterclaims. Century received $481,870 on the improper lien counterclaim. Century, Phase II, and Point Ruston LLC collectively received $311,894 for the aiding and abetting counterclaim award. And Century, Phase II, Point Ruston LLC, and Cohen collectively received a $500,000 sanctions award based on Kunitsa's misconduct during the arbitration hearing. The total award in favor of the Point Ruston parties was $1,293,764.

The arbitrator denied Cohen's request for attorney fees, although he prevailed on the conversion tort claim asserted against him and Phase II. The arbitrator concluded that Cohen could not enforce the subcontracts' attorney fee provisions to recover attorney fees on this claim because he never signed the subcontracts, and, alternatively, he was not the substantially prevailing party on the claims as a whole.

F.     Trial Court's Confirmation of the Arbitration Award and Final Judgment

The Point Ruston parties sought to vacate the arbitrator's award in superior court, and Serpanok asked the trial court to confirm the award. The trial court confirmed the award, denying the motion to vacate. The trial court exercised its discretion under RCW 4.56.060 to enter a setoff award, reducing the amount owed to Serpanok by the amount owed to the Point Ruston parties. Under Serpanok's setoff analysis, the maximum subcontract debt owed by Phase II and Century, as well as the maximum guaranty provided by Point Ruston LLC under the notes, was reduced by the amount Serpanok owed the Point Ruston parties, including the $500,000 sanction that had been awarded jointly to the Point Ruston parties.

10

After subtracting amounts due to the Point Ruston parties under the setoff and then adding interest accrued to date, the trial court entered an amended final judgment with the following awards:

Subcontract-based judgment

$5,003,370.09 against Phase II under garage and Building 1A subcontracts (comprised of $2,937,061.61 principal judgment after setoff + $709,031.68 in attorney fees and costs + $1,357,276.80 in prejudgment interest)

$732,444.01 of this amount was jointly owed by Century under the Building 1A subcontract (comprised of $700,214.60 principal judgment after setoff + $32,229.40 in prejudgment interest)

Total due under subcontracts after setoff, attorney fees, costs, and interest: $5,003,370.09

Guaranty/notes-based judgment

$2,470,449.69 against Point Ruston LLC (comprised of $2,105,769.29 in principal after setoff and attorney fees/costs + $364,680.40 in prejudgment interest)

Garage mechanic's lien

$3,281,135.00 against Phase II (comprised of $2,236,847.00 in principal + $1,044,288.00 in prejudgment interest)

**Total award in favor of Serpanok: $5,003,370.09 + $63,232.15 in attorney fees and costs for judgment entry proceedings.**

Following the arbitrator's mandate, the final judgment capped Serpanok's total recovery at the amount due under the subcontracts, which was then $5,003,370.09, plus postjudgment interest, which would accrue as described in the order. The trial court awarded Serpanok an additional $63,232.15 in attorney fees for postjudgment litigation. The Point Ruston parties were jointly and severally liable for the award.

11

Serpanok proceeded to foreclose on the mechanic's lien. Then in July 2020, Serpanok purchased the garage at a sheriff's sale for a credit bid of $3.4 million. The trial court confirmed the sale.[3]

At the time of the sheriff's sale, the judgment balances had further increased to reflect additional postjudgment interest and the total award in favor of Serpanok had increased to $5,194,360.36. The total amount guaranteed under the notes was $2,602,067.40.

The Point Ruston parties then moved to apply the foreclosure sale proceeds to ensure that "nothing further is owed by Point Ruston, LLC [the party that had provided the guaranty,] which is entitled to a satisfaction of judgment." CP (II) at 3305. The Point Ruston parties argued, "[T]he Court must ensure that the proceeds of the Garage foreclosure are applied against the amounts awarded under the Garage subcontract (owed by [Phase II]) and the Notes (owed by Point Ruston, LLC)." CP (II) at 3308. The Point Ruston parties proposed that the approximately $3.4 million foreclosure sale proceeds be applied to fully satisfy Point Ruston LLC's approximately $2.6 million guaranty.

Serpanok countered that the $3.4 million in foreclosure sale proceeds should be applied to reduce the overall debt owed by Phase II under the subcontracts from around $5.2 million to a balance of approximately $1.8 million. Serpanok contended that Point Ruston LLC's obligation as

---

[3] To the extent the Point Ruston parties sought a ruling from this court before June 19, 2021, when Phase II's redemption rights related to this sale were set to expire, this request was impossible to honor because one of these now-consolidated cases was set for oral argument on June 29, 2021. The Point Ruston parties did not file a motion to accelerate either case before or after oral argument was set. To the extent the Point Ruston parties intended the request in its brief to be a motion to accelerate, a motion to accelerate is not a dispositive motion under RAP 10.4(d), so it cannot be brought in a brief. *See Money Mailer, LLC v. Brewer*, 194 Wn.2d 111, 130, 449 P.3d 258 (2019) (citing RAP 17.4(d), which is identical to RAP 10.4(d)).

a guarantor would therefore be reduced to equal the $1.8 million subcontract balance, but not eliminated.

The trial court denied the Point Ruston parties' motion, adopted Serpanok's position that the foreclosure sale reduced Phase II's judgment on the mechanic's lien to zero, and reduced the judgment against the Point Ruston parties to the difference between the maximum award and the value of the foreclosure sale proceeds, about $1.8 million. After applying the garage foreclosure sale proceeds, the trial court determined that the obligations of the various Point Ruston parties were as follows:

Subcontract-based judgment

$1,759,216.87 against Phase II ($5,194,360.36 - $3,435,143.49)

$821,740.73 of this amount was jointly owed by Century on the Building 1A subcontract

Total still owed under the subcontracts: $1,759,216.87

Guaranty/notes-based judgment against Point Ruston LLC

$1,759,216.87

Garage mechanic's lien claim (against Phase II)

$0

**Total remaining balance against the Point Ruston parties: $1,759,216.87**.

The Point Ruston parties appeal the trial court's decision to affirm the arbitrator's award, as well as the trial court's denial of its motion to discharge the entirety of Point Ruston LLC's debt as a guarantor under the notes.

ANALYSIS

A.    Guaranties Generally

A guaranty "arises when one assumes an obligation to pay the debt of another." *Tr. of Strand v. Wel-Co Grp. Inc.*, 120 Wn. App. 828, 836, 86 P.3d 818 (2004); *see also* RESTATEMENT (THIRD) OF SURETYSHIP & GUAR. § 1 cmt. b (AM. LAW INST. 1996). "[T]he secondary obligation . . . protect[s] the obligee against the actual or potential nonperformance of the underlying obligation by giving the obligee recourse against the secondary obligor." RESTATEMENT § 1 cmt. h.

A secondary obligor does not have to guarantee the full amount of the principal obligor's debt. *Id.* at cmt. k. "The secondary obligation can be for a smaller amount or of a different character" so long as the arrangement "protect[s] the obligee against the actual or potential nonperformance of the underlying obligation by giving the obligee recourse against the secondary obligor." *Id.* A guarantor is discharged from liability "to the extent the borrower satisfies the underlying obligation. This is because the creditor has the right to only one performance." *Strand*, 120 Wn. App. at 836-37; *see also* RESTATEMENT §§ 1(1)(b), 19(a) & cmt. a.

Taken together, these general principles emphasize that the purpose of a guaranty is to ensure the creditor is protected from nonperformance of the principal obligor.

B.    Trial Court's Denial of the Motion for Discharge of Point Ruston LLC

The Point Ruston parties contend the trial court should have found that the foreclosure sale proceeds fully satisfied Point Ruston LLC's guaranty obligations to Serpanok. We disagree.

1.    Background on foreclosure sale proceeds and guarantor liability

While there are no Washington cases directly on point, case law from other jurisdictions holds that where foreclosure sale proceeds reduce but do not eliminate the underlying debt, the

14

guarantor remains obligated to the extent of the remaining debt, up to the maximum of the guaranty, until the principal obligor discharges the entirety of its debt.

In *Ralston-Purina Co. v. Bertie*, a poultry farm, Northwestern Poultry Growers, entered into a contract with a feed provider, Purina, while John and Irene Bertie provided "a personal guaranty . . . promising [to pay] any liabilities to Purina incurred by Northwestern" up to $95,000. 541 F.2d 1363, 1364 (9th Cir. 1976). Northwestern declared bankruptcy and "was unable to pay $141,597[] of its debt to Purina." *Id.* Purina recouped a portion of its debt through a sale of Northwestern's inventory and other collateral, but Northwestern still owed approximately $78,000. *Id.* at 1365. A jury found that, as guarantors, the Berties were thus liable for the $78,000 deficiency. *Id.*

On appeal, the Berties argued that the $95,000 cap on their guaranty obligation "limited the total amount of debt which Purina could extend to Northwestern and still remain within the total coverage of the Berties' guaranty." *Id.* at 1365. The Berties asserted that "the amount realized from the collateral should . . . have been subtracted from $95,000 not from $141,597[] to determine the extent of their liability for Northwestern's remaining debt to Purina." *Id.* The Ninth Circuit rejected this argument, reasoning that the guaranty agreement "can only reasonably be construed to limit the guarantors' potential liability to $95,000. The limitation is to the guarantors' agreement and in no way purports to limit or affect the underlying obligations of the customer." *Id.* Thus, *Ralston-Purina* supports Serpanok's argument that a guarantor remains liable until the last dollars owed are paid, up to the total amount that the guarantor has chosen to guaranty.

In *Southern Bank & Trust Co. v. Harley*, 292 S.C. 340, 341, 343, 356 S.E.2d 410 (Ct. App. 1987), the South Carolina Court of Appeals relied on *Ralston-Purina* to reject an argument almost

identical to the one presented here. In *Harley,* a bank lent money to an investment company. *Id.* at 341. Three separate guarantors guaranteed the loan up to $775,000. *Id.* The investment company also secured its debt with a real estate mortgage. *Id.* The investment company defaulted, and the bank foreclosed on the mortgage. *Id.* at 342. The foreclosure sale plus an additional payment netted $762,416 in proceeds, which was less than the $790,556 owed by the investment company to the bank. *Id.* at 341-42. The bank sued the guarantors for the deficiency. *Id.* at 342.

The court subtracted the amount recovered through the foreclosure sale "*from the total amount owed by the debtor*, not from the contractual limit on the guaranty." *Id.* at 343 (emphasis added). The court explained that "[r]equiring the Guarantors to pay this sum [would] not impose on them a liability greater than they agreed to assume" and would not "result in a double recovery to Southern" because "[i]f the Guarantors pay the full amount of the deficiency, the debt is not being paid twice; it is merely being paid in full." *Id.* at 342-43.

By contrast, in *BankEast v. Michalenoick*, 138 N.H. 367, 370-71, 639 A.2d 272 (1994), foreclosure sale proceeds extinguished a guarantor's liability where the guaranty agreement specifically provided, "'This guarantee shall be reduced to the extent of any principal pay[]down on the Obligations'" and the guaranty applied only to the first $100,000 of principal to be paid on the loan. Because the guaranty did "not specify the source of the pay[]down required to reduce the $100,000 and release the guarantor, or that foreclosure proceeds might be otherwise applied than to the front end of the note's obligations," the court held that "the guarantee requires reduction by the application of the foreclosure proceeds." *Id.* at 371.

16

Because the parties do not contest the underlying facts, the allocation of foreclosure sale proceeds here is a question of law that we review de novo. *See In re Tr's Sale of Real Prop. of Upton*, 102 Wn. App. 220, 222-23, 6 P.3d 1231 (2000).

2. <u>The trial court correctly allocated the foreclosure sale proceeds</u>

We find *Ralston-Purina* and *Harley* persuasive and hold that the trial court properly subtracted the amount of foreclosure sale proceeds from the underlying debt, rather than from the amount of Point Ruston LLC's guaranty. *See Ralston-Purina*, 541 F.2d at 1365; *Harley*, 292 S.C. at 343. Unlike in *BankEast*, where the guaranty agreement expressly stated that the guaranty was subject to a pay down provision, there is no evidence that Point Ruston LLC guaranteed only the *first* portion of any principal payment. Point Ruston LLC therefore remained obligated as a guarantor for the deficiency until it is paid, subject to the maximum total amount Point Ruston LLC agreed to pay. As a result, Point Ruston LLC was obligated to pay the amount that remained after subtracting the foreclosure sale proceeds from the underlying debt.

As Serpanok has explained, the Point Ruston parties "would have this Court hold that if John owes $10, and Mary has guaranteed $5 of John's debt, then John's $6 payment discharges Mary's guaranty rather than being reduced to $4. That is not how a guaranty works." Br. of Resp't (cause no. 54833-0-II) at 19. Rather, we agree with Serpanok that

> nothing in our law, or in equity[,] . . . authorizes a guarantor of a partially secured debt and an unsecured debt to mandate that proceeds from collateral sale on the partially secured debt be applied to discharge its guaranty on unsecured debts. If it were allowed to do so, it would put a guarantor in control of applying payments by others, and turn a guaranty from being a guaranty of the last dollars owed by a debtor, to a guaranty limited to the first dollars paid.

*Id.* at 20. We decline to adopt a "first dollars paid" approach to a guaranty unless the instrument, here the promissory note, contains an express agreement to that effect. The Point Ruston parties

17

point to no such language in the promissory notes at issue here.

Nor do we agree with the Point Ruston parties that the trial court's order allows Serpanok double recovery. As Division Three noted in *Strand*, "the creditor has the right to only one performance." 120 Wn. App. at 837. The secondary obligor's duty to perform is "discharged to the extent the [principal obligor] satisfies the underlying obligation." *Id.* at 836-37; *see also* RESTATEMENT § 19(a) & cmt. a.

Here, the guaranteed obligation was not fully satisfied, and the trial court prevented double recovery by partially reducing Point Ruston LLC's obligation, but the trial court appropriately left intact Point Ruston LLC's obligation to the extent some of the guaranteed debt remained unpaid. As in *Harley*, Point Ruston LLC's continuing liability for the amount remaining on the underlying obligation will not "result in a double recovery" for Serpanok because if Point Ruston LLC pays "the full amount of the deficiency, the debt is not being paid twice; it is merely being paid in full." 292 S.C. at 342-43.

We also reject the Point Ruston parties' suggestion that the trial court erred by applying the proceeds of the foreclosure sale "'to a debt unrelated to the source from which such proceeds were generated.'" Opening Br. of Appellants Point Ruston LLC, Point Ruston Phase II LLC, and Century Condominiums LLC (cause no. 54883-0-II) (Opening Br. of Appellants) at 8 (quoting *Ellingsen v. W. Farmers Ass'n*, 12 Wn. App. 423, 427, 529 P.2d 1163 (1974)). The Point Ruston parties are correct that the proceeds of a foreclosure sale generally must be applied to the debt secured by the foreclosed property. *See Cummings v. Erickson*, 116 Wash. 347, 350, 199 P. 736 (1921) (Where a creditor has secured part of their debt with a lien subject to a foreclosure sale "the presumption must be that the proceeds will be applied to the secured debt."); *see also* RCW

60.04.181(2). Here, the trial court properly applied the foreclosure sale proceeds to the debt owed by Phase II under the mechanic's lien and the garage subcontract. The Point Ruston parties offer no evidence to support their contention that the mechanic's lien also secured Point Ruston LLC's guaranty.

Finally, to the extent the Point Ruston parties argue that the trial court's imposition of joint and several liability on Phase II, Century, and Point Ruston LLC requires extinguishing Point Ruston LLC's liability entirely, we disagree. The principle of "joint and several liability" provides that "each liable party is individually responsible for the entire obligation" but recognizes that the obligee cannot receive more than the total relief. BLACK'S LAW DICTIONARY 1098 (11th ed. 2019). The combined effect of the trial court's final judgment imposing joint and several liability and its order confirming the foreclosure sale is that, after subtracting the $3.4 million recouped through the foreclosure sale from the $5.2 million underlying debt, Phase II and Point Ruston LLC properly remain jointly and severally liable for the $1.8 million balance.

In sum, the trial court properly confirmed the foreclosure sale and allocated its proceeds.

C.    Judicial Estoppel

The Point Ruston parties argue that the trial court erred by not granting their motion for allocation of the foreclosure sale proceeds under judicial estoppel because Serpanok advanced inconsistent arguments at different stages of the proceedings. According to the Point Ruston parties, Serpanok should have been estopped from arguing that the foreclosure sale proceeds did not fully satisfy Point Ruston LLC's debt because Serpanok previously acknowledged it was only entitled to a single satisfaction of the maximum amount due under the subcontracts. The Point Ruston parties also claim judicial estoppel on the basis that Serpanok previously argued that the

$500,000 sanction award in favor of the Point Ruston parties should be set off against the amount owed by Century and asserted that "'[f]ull payment to one of multiple co-obligees satisfies the debt to all oblige[es].'" Opening Br. of Appellants at 13 (first alteration in original). We disagree.

Judicial estoppel precludes a party from "'asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position.'" *Miller v. Campbell*, 164 Wn.2d 529, 539, 192 P.3d 352 (2008) (internal quotation marks omitted) (quoting *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007)). "The purpose of the doctrine is 'to preserve respect for judicial proceedings' and 'to avoid inconsistency, duplicity, and . . . waste of time.'" *Id.* 540 (alteration in original) (internal quotation marks omitted) (quoting *Arkison*, 160 Wn.2d at 538). In determining whether to apply judicial estoppel, courts consider three factors:

> "(1) [W]ether a party's later position is clearly inconsistent with its earlier position; (2) whether judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Id.* at 539 (internal quotation marks omitted) (quoting *Arkison*, 160 Wn.2d at 538-39). We review the applicability of judicial estoppel for an abuse of discretion. *Id.* at 536.

1.    Single satisfaction argument

In its arbitration brief, Serpanok said it was "entitled only to one satisfaction of [all the awards it sought] such that a payment on one of these obligation types, for example a payment on the Garage contract, reduces the obligations on the others (Garage lien and notes)." CP (II) at 3322. Serpanok then requested a total award of damages equal to the damages it sought on the basis of the subcontract based claims, "subject to one payment satisfaction." CP (II) at 3358.

20

In context, Serpanok's previous request for damages at the arbitration hearing was entirely consistent with its argument that the foreclosure sale proceeds should reduce the Point Ruston parties' total collective obligation on their remaining claims. The Point Ruston parties offer no evidence that Serpanok ever advocated for subtracting an entire partial payment from Point Ruston LLC's guaranteed debt, which could reduce Serpanok's total recovery below the total subcontract-based award. This is not a reasonable interpretation of Serpanok's position at any time in the proceeding, and the trial court properly rejected this judicial estoppel argument.

2.     Setoff argument

Likewise, Serpanok's previous argument about the setoff award was not inconsistent with its position on applying foreclosure sale proceeds. In its motion to confirm the arbitration award, Serpanok asked the trial court to subtract the amount it owed to the Point Ruston parties from the amount they owed Serpanok. Serpanok argued that applying the setoff to Century's debt fully discharged Serpanok's obligation to the Point Ruston parties "because the discharge of *the whole obligation* to one joint obligee, here Century, discharges that whole obligation to the other joint obligees in a joint judgment." CP (II) at 1028 (emphasis added).

Serpanok's setoff argument was not inconsistent with its foreclosure sale argument because the two situations are not comparable. The setoff accounted for the *entire* award owed by Serpanok to the joint defendants, fully discharging Serpanok's obligations to the Point Ruston parties. By contrast, the foreclosure sale proceeds represented only a *portion* of Phase II's debt to Serpanok. This claim would only have been inconsistent if Serpanok argued that payment of the *full* underlying debt by Phase II did not discharge Point Ruston LLC's liability as a secondary obligor. But that is not what Serpanok argued and the trial court correctly rejected this claim.

21

CONCLUSION

We affirm the trial court's allocation of foreclosure sale proceeds. In the unpublished portion of this opinion below, we affirm the underlying arbitration award and resolve the remaining claims in Serpanok's favor.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Unpublished text follows

The Point Ruston parties appeal the trial court's confirmation of the arbitration award and final judgment, arguing the award was procured by corruption, fraud, or undue means, the arbitrator exceeded his authority, and the award violated public policy. We reject the Point Ruston parties' claims.

ANALYSIS

A.     Standard of Review

"'[W]hen parties voluntarily submit to binding arbitration, they generally believe that they are trading their right to appeal an arbitration award for a relatively speedy and inexpensive resolution to their dispute.'" *Int'l Union of Operating Eng'rs, Local 286 (IUOE) v. Port of Seattle*, 176 Wn.2d 712, 720-21, 295 P.3d 736 (2013) (alteration in original) (quoting *Clark County Pub. Util. Dist. No. 1 v. Int'l Bhd. of Elec. Workers, Local 125*, 150 Wn.2d 237, 247, 76 P.3d 248 (2003)). Arbitration awards are thus subject to limited judicial review to avoid "call[ing] into question the finality of arbitration decisions and undermin[ing] alternative dispute resolution." *Id.* at 720.

We apply the same standard of review as the trial court that confirmed the award and consider only "'whether any of the statutory grounds for vacation exist.'" *Salewski v. Pilchuck Veterinary Hosp., Inc.*, 189 Wn. App. 898, 903-04, 359 P.3d 884 (2015) (quoting *Cummings v. Budget Tank Removal & Envtl. Servs., LLC*, 163 Wn. App. 379, 388, 260 P.3d 220 (2011)). "The party seeking to vacate the award bears the burden of showing that such grounds exist." *Id*. at 904.

RCW 7.04A.230(1)(a) and (d) set forth grounds requiring a court to vacate an arbitration award, including where "[t]he award was procured by corruption, fraud, or other undue means," or the "arbitrator exceeded [their] powers." To vacate an award as exceeding the arbitrator's powers, the challenger must establish an error apparent on the face of the arbitration award. *Salewski*, 189 Wn. App. at 904. Vacating an arbitration award on the basis of facial legal error is exceedingly rare because the "'facial legal error standard is a very narrow ground for vacating an arbitral award'" that "does not extend to a potential legal error that depends on the consideration of the specific evidence offered or to an indirect sufficiency of the evidence challenge." *Id.* (quoting *Broom v. Morgan Stanley DW, Inc.*, 169 Wn.2d 231, 239, 236 P.3d 182 (2010)).

The Washington Supreme Court has held that limiting judicial review of arbitration awards to facial error furthers "the purposes of arbitration" while simultaneously avoiding "obvious legal error." *Broom*, 169 Wn.2d at 239. "Courts are not permitted to conduct a trial de novo when reviewing the award, they 'do not look to the merits of the case, and they do not reexamine evidence.'" *Salewski*, 189 Wn. App. at 904 (quoting *Broom*, 169 Wn.2d at 239). This means "'[t]he error should be recognizable from the language of the award, as, for instance, where the arbitrator identifies a portion of the award as punitive damages in a jurisdiction that does not allow punitive damages.'" *Id.* (internal quotation marks omitted) (quoting *Cummings*, 163 Wn. App. at 389). Any

closer "review of arbitration decisions 'would weaken the value of bargained for, binding arbitration and could damage the freedom of contract.'" *IUOE*, 176 Wn.2d at 721 (quoting *Kitsap County Deputy Sheriff's Guild v. Kitsap County*, 167 Wn.2d 428, 435, 219 P.3d 675 (2009)). *But see Salewski*, 189 Wn. App. at 904 ("'Where a final award sets forth the arbitrator's reasoning along with the actual dollar amounts awarded, any issue of law evident in the reasoning may also be considered as part of the face of the award.'" (quoting *Cummings*, 163 Wn. App. 389)).

Because judicial review is limited to assessing whether the award contains a facial legal error, we do not reexamine the evidence supporting the arbitration award; we are instead "bound by the arbitrator's findings of fact." *IUOE*, 176 Wn.2d at 724; *see also* RCW 7.04A.230(1)(a)-(f). We also do not second-guess the arbitrator's exercise of discretion in crafting an appropriate remedy. *See Clark County*, 150 Wn.2d at 247, 249; *see also* Rule R-47(a) ("The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties.").

B.     Corruption, Fraud, or Other Undue Means under RCW 7.04A.230(1)(a)

Point Ruston parties argue the trial court erred by not vacating the arbitration award under RCW 7.04A.230(1)(a) because it claims the arbitration award was procured by corruption, fraud, or other undue means. We disagree.

The Point Ruston parties do not allege that corruption, fraud, or other undue means occurred in the arbitration process itself. They instead allege that corruption and fraud occurred during the formation and performance of the underlying contracts. But RCW 7.04A.230(1)(a) vacation addresses corruption, fraud, or other undue means *in the process of the arbitration*, not the underlying facts of the dispute. Because the Point Ruston parties point to no facts suggesting

*the arbitrator's award* was obtained through corruption, fraud, or other undue means, the award could not be reversed on this basis.

C.     Authority of the Arbitrator Under RCW 7.04A.230(1)(d)

1.     Illegality defense

The Point Ruston parties argue that the award contains a facial error because the arbitrator applied the wrong legal standard to their affirmative defense of illegality. According to the Point Ruston parties, the arbitrator improperly assessed whether the illegal conduct proximately caused damages to them when he should have instead determined whether the contracts grew out of the illegal conduct. We disagree.

The Point Ruston parties are correct that courts generally do not enforce illegal contracts or contracts that grow out of illegal acts. *See Golberg v. Sanglier*, 96 Wn.2d 874, 879, 639 P.2d 1347, 647 P.2d 489 (1982). But the "'doctrine of severability' . . . is a limited exception to the rule that courts will not enforce an illegal contract." *Brougham v. Swarva*, 34 Wn. App. 68, 79, 661 P.2d 138 (1983). In *Sherwood & Roberts-Yakima, Inc. v Cohan*, Division One held that if the contract being enforced "is related to an illegal transaction, but is not illegal in and of itself" the party seeking enforcement may still recover "notwithstanding the related illegal transaction" so long as "the aid of the illegal transaction is not relied upon or required, or if the promise sued upon is remote from or collateral to the illegal transaction, or is supported by independent consideration." 2 Wn. App. 703, 710, 469 P.2d 574 (1970); *see also Ten Bridges, LLC v. Guandai*, 15 Wn. App. 2d 223, 239 n.46, 474 P.3d 1060 (2020) (citing *Sherwood* to describe the doctrine of severability), *review denied*, 197 Wn.2d 1011 (2021). "[S]o long as 'a party can show a right of recovery without relying on the illegal contract and without having the court sanction the same

[they] may recover in any appropriate action.'" *Brougham*, 34 Wn. App. at 80 (internal quotation marks omitted) (quoting *Melton v. United Retail Merchants*, 24 Wn.2d 145, 162, 163 P.2d 619 (1945)).

Here, the arbitrator did not specifically recite the severability test or cite severability cases but, nonetheless, the arbitrator effectively addressed severability. The arbitrator evaluated whether the subcontracts were "induced" by the illegal agreement between Serpanok and Hutchinson, or whether they were collateral to it. *See, e.g.*, CP (I) at 2764. For example, the arbitrator acknowledged that Serpanok improperly paid kickbacks to Hutchinson, but observed that the kickback scheme did not ultimately impact the formation of the subcontracts. Although Serpanok aided and abetted Hutchinson's breach of his fiduciary duties to the Point Ruston parties, the arbitrator noted that this misconduct did not automatically "render all contracts in which the employee had any role in the counterparty's performance 'illegal contracts.'" CP (I) at 2764. In order for the subcontracts to be unenforceable under the defense of illegality, there would need to be some evidence that the kickback scheme "fraudulently induced or otherwise caused the parties to enter into the two construction subcontracts, change orders, or Notes." CP (I) at 2765. Because there was no evidence this occurred, the arbitrator concluded the subcontracts were collateral to the illegal kickback scheme and thus enforceable.

The arbitrator found that Cohen's conduct after firing Hutchinson was persuasive evidence that the subcontracts were collateral to the illegal kickback scheme. The Point Ruston parties knew about Hutchinson's misconduct by November 2015 and yet continued to "execute[] numerous additional subsequent change orders[,] . . . accept[] . . . valuable work done for them by Serpanok[,] . . . and then later . . . assert[] subcontract-based counterclaims in this arbitration." CP (I) at 364.

Through this conduct, the arbitrator concluded, the Point Ruston parties "ratif[ied] and insist[ed] upon continued performance of the two subcontracts." *Id.*

The arbitrator further pointed out that Hutchinson was not the only Point Ruston official to approve the subcontracts, even while he was carrying out his illegal scheme. Yuchun Santory, a Point Ruston manager not implicated in the kickback scheme, deemed Serpanok's bids more desirable than the next available options. The "next closest bid to Serpanok's on Building 1A was $4.9 million higher, prompting Mr. Santory to remark 'we are looking really good for this . . . YIKES.'" CP (I) at 363 (alteration in original). Similarly, the arbitrator found "the evidence presented concerning the Garage subcontract was less dramatic but also did not establish that the terms of that subcontract, as finalized, damaged [Phase II] when compared to its other alternatives documented in the evidence." *Id.*

The arbitrator's rejection of the Point Ruston parties' illegality defense does not reflect a facial legal error apparent in the language of the award. *See Salewski*, 189 Wn. App. at 904. By reviewing whether the subcontracts Serpanok sued to enforce were collateral to Serpanok's and Hutchinson's illegal agreement, the arbitrator's legal analysis was consistent with the doctrine of severability articulated in *Sherwood*. 2 Wn. App. at 710. Even if the arbitrator did not explicitly refer to the doctrine of severability, any failure to properly name the doctrine is nothing like the examples of facial legal errors that permit courts to vacate arbitration awards, such as imposing punitive damages in a jurisdiction that does not permit them. *Salewski*, 189 Wn. App. at 904.

The Point Ruston parties encourage us to reevaluate the evidence and make a different determination as to whether the kickback scheme was collateral to or severable from the subcontracts, change orders, and notes. But we may not reexamine the arbitrator's factual findings

supporting its conclusion that the subcontracts were collateral to the illegality. *Id.* We also do not reweigh the evidence when reviewing an arbitrator's award. *Id.*; *IUOE*, 176 Wn.2d at 724.

We therefore reject the Point Ruston parties' argument that the arbitrator improperly considered whether the subcontracts, change orders, and notes were "proximately caused" by the kickback scheme rather than whether they "grew immediately out of" the kickbacks. *See* Am. Opening Br. of Appellants Point Ruston LLC, Point Ruston Phase II LLC, Century Condominiums LLC, and Michael Cohen (cause no. 54413-0-II) (Am. Opening Br. of Appellants) at 23-24. The arbitrator concluded that the subcontracts, change orders, and promissory notes were collateral to the kickback scheme, which was equivalent to rejecting the Point Ruston parties' assertion that the contracts grew out of the kickbacks. Severability is an exception to the illegality defense precisely because there is no reason to void collateral contracts that did not grow out of illegal conduct. *See Brougham*, 34 Wn. App. at 81. The arbitrator's evaluation of whether the subcontracts, change orders, and notes were collateral to the illegal conduct was consistent with the "grew out of" standard and does not give rise to a reversible facial error.

The Point Ruston parties' reliance on *GMB Enterprises, Inc. v. B-3 Enterprises, Inc.*, 39 Wn. App. 678, 695 P.2d 145 (1985), also does not establish that this arbitration award was invalid. The *GMB* court concluded that the contract in that case grew out of an illegal act and was void. *Id.* at 684, 688. The trial court relied on equity and public policy principles because the court was concerned that enforcing the contract would undermine efforts to deter similar illegal transactions in the future. *Id.* at 687-88. By contrast, the arbitration award here did not allow Serpanok to walk away from its kickback scheme unpunished. The arbitrator's award in favor of the Point Ruston

parties included not only the amount of the kickbacks but also the amount that Hutchinson was compensated while he was breaching his fiduciary duties and attempting to benefit Serpanok.

Finally, the arbitrator had broad independent authority to issue equitable relief under Rule R-47(a), and the award explicitly referenced this authority when denying the Point Ruston parties' illegality defense. The arbitrator stated it "would not be 'just and equitable'" to determine "that the subcontracts, change orders, and Notes" were "'illegal contracts'" and thus to "deny [Serpanok] recovery for millions of dollars due and owing under the parties' contracts in return for valuable work done and accepted." CP (I) at 2767. The arbitrator awarded over $1.2 million to the Point Ruston parties for the illegal kickback scheme, improper lien filing, and sanctions. Regardless of the doctrine of severability, the arbitrator's independent authority to craft equitable relief under Rule R-47(a) supports the overall award. And we do not evaluate an arbitrator's exercise of discretion in crafting its remedies—we look only for legal errors apparent on the face of the arbitration award. *Clark County*, 150 Wn.2d at 247; *Broom*, 169 Wn.2d at 239.

In sum, the arbitrator properly rejected the illegality defense.

2.      Denial of counterclaims for fraud and breach of duty of good faith and fair dealing

The Point Ruston parties claim the arbitration award was facially erroneous because the arbitrator required them to prove actual damages stemming from Serpanok's conduct in order to prevail on its counterclaims for fraudulent inducement and breach of the duty of good faith and fair dealing. The Point Ruston parties rely on *Amtruck Factors v. International Forest Products*, which held, "[I]t is not necessary to show out-of-pocket loss in order to prove damages where a kickback scheme is alleged." 59 Wn. App. 8, 15, 795 P.2d 742 (1990), *abrogated on other grounds by Ross v. Kirner*, 162 Wn.2d 493, 172 P.3d 701 (2007). The Point Ruston parties contend that the

existence of a kickback scheme was sufficient for the arbitrator to find subcontracts were fraudulently induced and unenforceable, regardless of whether they otherwise established the elements of fraud. According to the Point Ruston parties, the existence of the kickback scheme was also enough for them to prevail on their breach of the duty of good faith and fair dealing counterclaim, even if the evidence did not otherwise establish this claim. The Point Ruston parties mischaracterize the ultimate holding of *Amtruck*, and we reject this argument.

*Amtruck* holds only that a court cannot dismiss a claim in a kickback case on the grounds that the defendant did not suffer out-of-pocket damages. *Id.* at 15-16. The issue in *Amtruck* was whether the measure of damages resulting from a kickback scheme was limited to the amount of unreasonable and unagreed to charges, requiring a showing of out-of-pocket loss, or whether the measure was the amount paid in kickbacks. *Id.* at 14-16. The court acknowledged that, generally, the measure of damages in a case involving fraud is "whatever losses were proximately caused by the fraud or misrepresentation." *Id.* at 14. But Division One articulated a different rule for kickback cases, drawing on case law from other jurisdictions and "hold[ing] that it is not necessary to show out-of-pocket loss in order to prove damages where a kickback scheme is alleged." *Id.* at 15.

Under *Amtruck*, a claimant must still meet the elements of whatever claim they are asserting, but they can receive damages measured by the amount of the kickback payments if they cannot show an out-of-pocket loss. *See id.* Division One did not hold that the defendants actually prevailed on their counterclaims, only that they should have been permitted to assert them, and the trial court erred by dismissing them as a matter of law under the assumption that the defendants could not prevail unless they showed out-of-pocket damages in excess of the kickback payments. *See id.* at 13, 17. Nor did the *Amtruck* court suggest a party could be absolved of all burdens under

a contract where it had already received all of the benefits. *Amtruck*'s actual holding—that kickback payments could define the measure of damages if the defendants could not otherwise show harm—was narrower than the Point Ruston parties contend.

Contrary to the Point Ruston parties' arguments, the arbitrator here *did* award the relief authorized by *Amtruck*. The Point Ruston parties prevailed on the counterclaim alleging that Serpanok aided and abetted Hutchinson's breach of fiduciary duties because they presented evidence sufficient to meet all of the elements of this claim. The Point Ruston parties' damages correspond to *both* the $80,000 in kickbacks paid to Hutchinson *and* the amount of compensation that Hutchinson was paid for his work during the time Serpanok was aiding Hutchinson's breach of his fiduciary duties, for a total award of more than $300,000. The arbitrator properly rejected the Point Ruston parties' breach of the duty of good faith and fair dealing and fraudulent inducement counterclaims not because it refused to award them damages equal to the kickback payments, but because it had already granted this relief *and* because, unlike the aiding and abetting counterclaim, the arbitrator found the Point Ruston parties failed to meet all required elements of these other counterclaims.

The arbitrator properly rejected the Point Ruston parties' breach of the duty of good faith and fair dealing counterclaim because he found that they failed to prove the kickback scheme proximately caused harm beyond the breach of fiduciary duties. In addition, the arbitrator found the evidence presented in support of the common law fraud counterclaim did not establish three of the nine required elements of common law fraud by clear, cogent, and convincing evidence. CP (I) at 363 (citing *Williams v. Joslin*, 65 Wn.2d 696, 697, 399 P.2d 308 (1965)). The arbitrator found that the Point Ruston parties failed to show reliance on a representation, the right to rely on it, and

31

consequent damages. We do not reweigh the evidence. *IUOE*, 176 Wn.2d at 724; *Salewski*, 189 Wn. App. at 904.

The arbitrator properly denied the Point Ruston parties' counterclaims for fraud and breach of the duty of good faith and fair dealing.

### 3. Public policy tort counterclaim

The arbitrator declined to adopt the Point Ruston parties' admittedly novel legal theory that they should be able to recover based on a public policy created by Washington's commercial bribery statute. The Point Ruston parties concede that no such public policy tort exists or existed at the time of the arbitration award, but it faults the arbitrator for not recognizing one. We disagree.

The arbitrator's decision not to grant relief under a novel theory of liability does not create a legal error on the face of the award. *See Salewski*, 189 Wn. App. at 904; *Broom*, 169 Wn.2d at 239. To the extent the Point Ruston parties rely on *Federated Services Insurance Co. v. Estate of Norberg*, 101 Wn. App. 119, 125, 4 P.3d 844 (2000), that reliance is misplaced. In *Norberg*, the arbitration panel addressed a novel legal question, noting that the law on the issue was "sparse," and the arbitrators encouraged the parties to seek judicial review. *Id.* at 124-25. But *Norberg* does not stand for the proposition that the presentation of a novel legal theory always warrants judicial intervention. In *Norberg*, there was an error of law on the face of the arbitration award because the arbitration panel had improperly recognized a new avenue for obtaining damages in a survival action. *Id.* Here, the arbitrator declined to recognize a novel claim, and the arbitrator's decision did not conflict with existing law. The arbitrator did not commit facial legal error or exceed his authority.

D.      Whether the Arbitration Award Violated Public Policy

The Point Ruston parties argue that the arbitrator's award violated "long-established Washington public policy that courts do not condone corrupt and fraudulent acts like bribery and kickbacks and they will not lend their aid to the perpetrators of these acts." Am. Opening Br. of Appellants at 41. The award, according to the Point Ruston parties, condones fraudulent conduct and is therefore against public policy because it "enforced contracts growing immediately out of that illegal conduct" and awarded "Serpanok millions of dollars in damages." *Id.* at 42. We disagree.

Although judicial review of arbitration awards is generally limited to the statutory grounds in RCW 7.04A.230(1), "like any other contract—an arbitration decision . . . can be vacated if it violates public policy." *Kitsap County*, 167 Wn.2d at 435. But an arbitration award will only be vacated on public policy grounds if it violates an "'explicit,' 'well defined,' and 'dominant' public policy, not simply 'general considerations of supposed public interests.'" *Id.* (internal quotation marks omitted) (quoting *E. Associated Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 62, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000)).

Here, the Point Ruston parties recovered more than $1 million in damages and sanctions arising out of the kickback scheme and Serpanok's attempts to cover up the kickback payments, as well as the improper placement of a lien. The arbitrator did not ignore Serpanok's bad acts. Because there were no facial errors and the arbitrator properly exercised his powers and discretion to award just and equitable relief to both sides, there is no reason to hold that the arbitration award violated public policy.

E.      Denial of Cohen's Request for Attorney Fees

The Point Ruston parties argue that the trial court committed facial error by confirming the arbitrator's decision not to award attorney fees to Cohen, who prevailed on the conversion claim asserted jointly against him and Phase II. The Point Ruston parties assert that because this was the only claim against Cohen, he should have been considered a substantially prevailing party as to that claim and he was therefore entitled to attorney fees. We reject this argument.

Under Rule R-47(d), "The award of the arbitrator(s) may include . . . an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement." Both subcontracts' arbitration clauses contained identical attorney fees provisions stating, "'The arbitrator shall determine that one party has substantially prevailed and shall award to that party in addition to any other relief granted, that part[y's] actual attorney's fees and costs of arbitration.'" CP (I) at 2771 (quoting subcontracts).

The arbitrator held that Cohen was "not subject to the . . . 'one party' fee-shifting procedure because he is not a party to the subcontracts . . . [or] Notes." CP (I) at 2772. Alternatively, the arbitrator concluded Cohen was not entitled to attorney fees because, although Serpanok "did not prevail on all issues," it "prevail[ed] on the central issues." CP (I) at 2772. For that reason, the arbitrator reasoned, "[E]ven if Mr. Cohen's application could be allowed to proceed pursuant to [the attorney fees provision of the subcontracts] on a third-party beneficiary or similar basis, his application would still fail because it would then become subject to the 'one-party' determination procedure required" under the subcontracts' attorney fees provision. CP (I) at 2773.

To the extent the Point Ruston parties cite case law suggesting the arbitrator should have assessed attorney fees on a claim-by-claim basis, this argument fails because the arbitration

34

agreement was the applicable authority for attorney fees in this case. *See* Rule R-47(d). And here, the attorney fees provision in the arbitration agreement did not allow for separate attorney fees awards on individual claims. The arbitrator properly deemed Serpanok the substantially prevailing party overall and therefore correctly denied Cohen's request for attorney fees on the conversion claim. The trial court therefore did not err by confirming the arbitrator's attorney fees award.

F.      Sanctions Award Setoff

The Point Ruston parties argue that the trial court erred by applying the arbitrator's $500,000 sanction awarded in their favor as a setoff against the amount Century owed to Serpanok. They claim the superior court modified the arbitration award without authority and abused its discretion because it inequitably "deprived Cohen of any proceeds from the sanctions he was jointly awarded." Am. Opening Br. of Appellants at 48. The Point Ruston parties claim at least some portion of the $500,000 sanction should have been awarded directly to Cohen, or the parties should have been permitted to allocate the sanction award among them and Cohen however they saw fit. We disagree.

Under RCW 4.56.060, "[i]f the amount of the setoff [in favor of the defendant], duly established, be . . . less than the [amount owed to the] plaintiff[] . . . the plaintiff shall have judgment for the residue only." "The determination of whether to set off one judgment against another rests within the discretion of a court exercising equity powers." *Olmsted v. Mulder*, 72 Wn. App. 169, 182, 863 P.2d 1355 (1993).

Here, the arbitration award stated, "Respondents are hereby awarded $500,000 as an appropriate monetary sanction against [Serpanok] on account of [Serpanok's] acts of spoliation and discovery abuse." CP (I) at 2768. The arbitration award expressly stated it was not deciding

how awards would be allocated among the various codefendants or plaintiffs. In a section titled "Net Relief Awarded," the award stated, "Distinctions between the individual parties' separate payment responsibilities aside for the moment, and including the interest and bond costs awarded, and excluding the awards of fees and expenses, [Serpanok] is awarded a total recovery of $4,646,062, and [Point Ruston] Respondents are awarded a total recovery of $1,293,764." CP (I) at 2774-75 (boldface and underscore omitted).

To the extent the Point Ruston parties assign error to the setoff award, we reject that argument because the trial court also ordered that "Defendants Point Ruston Phase II, LLC, Century Condominiums, LLC, and Point Ruston, LLC, [were] jointly and severally liable" for the judgments against them. CP (I) at 2890. *Black's Law Dictionary* defines "joint and several liability" as:

> Liability that may be apportioned either among two or more parties or to only one or a few select members of the group, at the adversary's discretion. Thus, each liable party is individually responsible for the entire obligation, but a paying party may have a right of contribution or indemnity from nonpaying parties.

BLACK'S, *supra*, 1098. Accordingly, the setoff award reduced the entire obligation for which each of the jointly and severally liable defendants was responsible. This is reflected in the calculations that Serpanok proposed and the trial court adopted because the setoff was ultimately credited against the amount owed for each of the Point Ruston parties.

With regard to Cohen, the trial court's setoff order does prevent him from personally collecting any portion of the $500,000, but this result is not inequitable. Cohen's involvement as a defendant was limited to the conversion claim on which he prevailed. Nothing in the arbitrator's award suggests that the sanctions, which were imposed because Kunitsa hid evidence of the

36

kickback payments, had anything to do with the conversion claim. Cohen was not among the jointly and severally liable defendants. Given the facts of this case, we conclude the trial court did not abuse its discretion by including the sanction award in the amount to be set off against the judgment in favor of Serpanok. *See Olmsted*, 72 Wn. App. at 182. We hold that the trial court did not abuse its discretion by including the $500,000 sanction in the set off determination.

G.      Attorney Fees on Appeal

The Point Ruston parties and Serpanok each request appellate attorney fees under RAP 18.1 and the attorney fee provisions in the subcontracts. We grant Serpanok's request for appellate attorney fees for its claims in both the published and unpublished portions of this opinion and in both of the consolidated appeals.

"Attorney fees may be awarded at the appellate level only when authorized by a contract, a statute, or a recognized ground of equity." *Workman v. Klinkenberg*, 6 Wn. App. 2d 291, 308, 430 P.3d 716 (2018). Both promissory notes contained attorney fees provisions allowing the prevailing party to collect reasonable attorney fees and costs "incurred in collecting or enforcing this Note and protecting or realizing on any collateral," including fees and costs associated with appeal and postjudgment collection proceedings. CP (I) at 1707. Moreover, RCW 60.04.181(3) provides that a prevailing party in an action to enforce a mechanic's lien, in both arbitration and judicial proceedings, is entitled to reasonable attorney fees and costs, which also authorizes awarding attorney fees on the claims arising from the foreclosure sale. Because we affirm in Serpanok's favor, we also grant Serpanok's request for attorney fees as a prevailing party on all claims.

CONCLUSION

We affirm the arbitration award and the trial court's judgment and grant Serpanok's request

for attorney fees on appeal.

Glasgow, A.C.J.

We concur:

Cruser, J.

Veljacic, J.